Ella BARTELL, Plaintiff,

v.

Loretta LOHISER, Gerald Rein, Michael Roxberry, Lloyd Fett, Gerald Miller, Individually, and in their official capacity, State of Michigan, Michigan Family Independence Agency in the County of Jackson, Patricia Kempter, Patrick Okoronkwo, Individually and in their official capacity, Lutheran Social Services of Michigan, Jointly and Severally, Defendants.

No. 96–CV–60416–AA.

United States District Court, E.D. Michigan, Southern Division.

July 1, 1998.

Ann Mandt, Charfoos & Christensen, Detroit, Michigan, for plaintiff.

Margaret A. Nelson, Assistant Attorney General, Tort Defense Division, Lansing, Michigan, for defendant Loretta Lohiser.

Alvin A. Rutledge, Mary L. Dresbach Detroit, Michigan, for defendants Patricia Kempter, Patrick Okoronkwo, Luteran Social Services of Michigan.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HACKETT, District Judge.

On May 20, 1996, the Jackson County Probate Court terminated plaintiff's parental

rights to her then seven-year-old son William Stanley. The probate court based its decision on plaintiff's intellectual deficiencies and emotional problems which prevented her from caring for her son whose own developmental disorders made him difficult to control. Plaintiff Ella Bartell filed this civil rights action against 15 defendants involved in the proceedings that terminated her parental rights. Two of the defendants, Frank VanGoetham and Woodbridge Behavioral Management Consultants, were dismissed by prior order of this court. Plaintiff also stipulated to dismissal of three other defendants: the county prosecutor; the County of Jackson; and, Woodbridge Psychological Center. Defendant Gerald Miller was never served with a copy of the summons and complaint. The remaining nine defendants have filed motions for summary judgment. For the reasons stated below, defendants' motions shall be granted.

## THE PARTIES

Two motions for summary judgment are presently before the court. One was filed by six State of Michigan defendants (the State defendants) represented by the Michigan Attorney General's Office. These defendants are (1) the State of Michigan; (2) Michigan Family Independent Agency (FIA) (formerly known as Department of Social Services); (3) Lloyd Fett, county director of the Jackson County FIA; (4) Michael Roxberry, a foster care supervisor in the Jackson County FIA; (5) Loretta Lohiser, protective services worker in Jackson County FIA; and, (6) Gerald Rein, protective services worker in Jackson County FIA. Gerald Miller, former director of FIA, also was named as a defendant in this lawsuit, but he has not joined the other state defendants in their motion for summary judgment as he was never served with the summons and complaint and, thus, is entitled to dismissal pursuant to Fed.R.Civ.P. 4(m).

The other motion for summary judgment was filed by the remaining three non-governmental employees: (1) Lutheran Social Services (LSS), who contracted with FIA to provide foster care services to plaintiff's son; (2) Patricia Kempter, LSS case worker; and,

(3) Patrick Okoronkwo, LSS supervisor (collectively, the LSS defendants).

## BACKGROUND

Plaintiff Ella Bartell and Kern Stanley are the biological parents of William Stanley. William was born on August 20, 1987. According to the complaint, Ella sought help from Jackson County FIA in 1988 or 1989 because of William's aggressive and hyperactive behavior and the FIA responded by providing parent aides. (Complaint ¶ 18). Between 1992 and 1993, Bartell was hospitalized for depression and attempted suicide. (Complaint, ¶ 19). In September, 1992, Jackson County Protective Services began investigating Bartell because of complaints that she was abusing her children and engaging in violent fights with William's father. (State's Exhibit 3). During the investigation, both parents admitted to marital difficulties, but Ella denied charges of verbally and physically abusing William. As a result of that investigation, parent aides were assigned. (State's Exhibit 3). At that time, defendant Loretta Lohiser was the supervisor of the parent aide program. (State's Exhibit 4, 33).

In August, 1993, Bartell sought treatment for William's hyperactivity problems and voluntarily placed him in the St. Louis Center in Chelsea, Michigan. (Complaint, ¶ 20). The St. Louis Center is a residential facility for mentally disabled and emotionally impaired boys. William stayed in the center for about one year until he was discharged due to his behavioral problems and his hospitalization at the University of Michigan Children's Psychiatric Unit. (State's Exhibit 7, ¶ 2-G). While arrangements were being made to transfer William from the St. Louis home, Loretta Lohiser, who was then employed as a protective services worker for Jackson County FIA, was assigned to his case. After William was discharged from the St. Louis Center, plaintiff claims that Lohiser persuaded her to voluntarily place William in foster care by assuring her that once she was able to care for William, he would be returned to her. (Complaint, ¶ 21; Plaintiff's Exhibit 3, 152–53). During this voluntary placement, Lohiser claims that Bartell's visits with her son were erratic and that after their visits,

his foster parents noted that he became agitated and uncontrollable. (State's Exhibit 4, 30). Bartell asked to have William returned to her in December, 1994. (State's Exhibit 4, 30). Shortly thereafter, Lohiser filed a petition asking the court to take over jurisdiction of William. The court denied the petition and on March 1, 1995, William returned to his mother.

The next day, protective services worker Gerald Rein filed a second petition with the Jackson County Probate Court to place William in temporary custody. (State's Exhibit 10). On March 9, 1995, Judge Vandercook held a hearing and granted the petition which continued William's out of home placement. (State's Exhibit 13). In her order, Judge Vandercook ruled that removal of the child from the custody of Bartell was necessary to protect him from the substantial risk of harm to his life, physical health or mental well being if he remained in her care. (State's Exhibit 13).

After William was placed under the care of FIA, that agency contracted with LSS to provide foster care services. (Complaint, ¶ 25). FIA supervisor Michael Roxberry testified during his deposition, that the state purchases foster care services when the state is unable to meet the needs of a particular child. (State's Exhibit 3, 31). For example, services might be purchased when the state cannot place a child near the biological parent to facilitate the visitation or the state cannot arrange to keep siblings together. Once William's case was assigned to LSS, FIA continued to closely monitor it. (State's Exhibit 3, 36–39). Both an FIA caseworker and supervisor oversaw the services provided by LSS. (State's Exhibit 3, 36–39). LSS submitted its initial service plan to FIA on April 2, 1995. (State's Exhibit 15). LSS caseworker Patricia Kempker and supervisor Patrick Okoronkwo both signed the report. It evaluated William's situation, established a plan for his care, set goals for his progress, and made recommendations. The initial case plan stated that LSS's goal for William was to reunite him with his mother, although the plan noted that the goal was unlikely "given the parents' limitations and the severity of William's behaviors." (State's Exhibit 15.)

FIA supervisor Roxberry approved the plan and instructed the LSS caseworker and FIA caseworker assigned to the case to include a statement from the foster parents on further reports. (State's Exhibit 3, 43–44). LSS submitted updated plans to FIA quarterly. (Exhibit 15). FIA closely monitored and reviewed LSS's work to ensure that it met all requirements of FIA's foster care program, the court's orders, and state law. (State's Exhibit 3, 36–42). 

While William was placed in foster care through LSS, the Jackson County Probate Court continued to review the case through four hearings held between September, 1995 and April, 1996. (State's Exhibit 4). During that time period, plaintiff claims that she complied with LSS's requirements that she attend parenting classes, receive therapy, and participate in visitation with her son. (Complaint, ¶ 27). Because plaintiff had problems controlling William's behavior and was unable to parent him without seeking the assistance of her boyfriend or William's paternal grandparents, however, her visitation was reduced from unsupervised to supervised. (State's Exhibit 15).

After William had been in foster care through LSS for one year, LSS requested that plaintiff's parental rights be terminated. (State's Exhibit 16). A hearing was held before Judge Vandercook of the Jackson County Probate Court on May 15, 1996. At the hearing, plaintiff was represented by counsel. On May 20, 1996, Judge Vandercook issued a written opinion terminating plaintiff's parental rights.

In her written opinion, Judge Vandercook found that plaintiff was unable to care for William due to her own mental and emotional limitations and due to her son's developmental disorders. In reaching this conclusion, Judge Vandercook relied, in part, on the reports of three psychologists, all of whom reported that plaintiff was incapable of functioning as William's primary care-giver. Psychologist VanGoethem performed an evaluation of plaintiff which indicated that she is intellectually limited with a verbal IQ of 74, and diagnosed her with major depression and dependent personality disorder. He also noted a number of other factors which

might limit plaintiff's ability to parent, including her immaturity, unresolved conflicts with her own care givers, pathological and self-abusive behaviors, suicide attempts, and low self esteem. Psychologist Rutledge similarly reported that plaintiff's ability to control William had decreased over the course of his three sessions with the two of them. He further reported that William's own behavioral problems required that he have a parent who would provide emotional stability, firmness, and sufficient intelligence to cope with his special needs. Rutledge reported that plaintiff was incapable of providing the type of parenting which William required. Moreover, psychologist Hansen reported that although plaintiff had made progress in her treatment, she still was unable to function as his primary care-giver.

The court also considered a letter written by Seque, Inc., a firm which provided emotional support and advocacy for plaintiff's emotional problems. In her written opinion, Judge Vandercook noted that Seque reported that plaintiff's condition had improved and that the number of crisis interventions and 911 calls had declined. Plaintiff seeks to rely on Seque's letter in support of this lawsuit.

Plaintiff never appealed the decision of the Jackson County Probate Court which terminated her parental rights. Instead, she filed this lawsuit alleging that the termination of her parental rights was discriminatory based on her intellectual and emotional disabilities and her son's developmental disorder and behavioral problems. Plaintiff filed a seven-count complaint. Counts I through III allege violations of plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985 and 1986. Count IV alleges disability discrimination pursuant to the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132. Counts V through VII allege state law claims of negligence, violations of Michigan Handicappers' Civil Rights Act, M.C.L. § 37.1101 *et seq.*, and intentional infliction of emotional distress. The State and LSS defendants have both moved for summary judgment of all claims on the basis of absolute or qualified immunity.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See F.D.I.C. v. Alexander,* 78 F.3d 1103, 1106 (6th Cir.1996). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Kutrom Corp. v. City of Center Line,* 979 F.2d 1171, 1174 (6th Cir.1992).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.,* 42 F.3d 981, 984 (6th Cir.1994) (citing *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989)). The evidence and all inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec. Inc. v. Mahoning County Comm'r,* 85 F.3d 257, 259 (6th Cir.1996); *Wilson v. Stroh Co., Inc.,* 952 F.2d 942, 945 (6th Cir.1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 774 (6th Cir.1996).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with

"specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.1995). Mere allegations or denials in the non-movant's pleadings will not meet this burden. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Further, the non-moving party cannot rest on its pleadings to avoid summary judgment. It must support its claim with some probative evidence. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

## ANALYSIS

A. *Qualified Immunity Applies to Governmental and Private Foster Care Workers*

Both the State and LSS defendants argue that they are entitled to qualified immunity.[1] Traditionally, qualified immunity has shielded *governmental actors* from liability for money damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "It is not necessary that the very action have been previously held unlawful but, given the preexisting law, the unlawfulness ·of the conduct must have been apparent." *Barton v. Norrod*, 106 F.3d 1289, 1293 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 341, 139 L.Ed.2d 265 (1997) (citation omitted). In this case, there is no question that the six State defendants, who are all governmental actors, are entitled to assert the defense. Before addressing whether the facts of this case support application of the doctrine to the governmental defendants, however, the court first determines whether the private parties in this case, defendant LSS and the two individual LSS employees whom plaintiff sued, Okoronkwo and Kempter, also may rely upon the doctrine.

The Supreme Court most recently addressed the question of whether qualified immunity shields from suit a private party charged with conspiring with state officials to violate another's constitutional rights. *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). In that case, employees of a private prison operating under a contract with the state, sought to invoke qualified immunity to shield them from liability against a prisoner's charge that they allegedly placed him in extremely tight physical restraints. *Id.*, 117 S.Ct. at 2102. The Supreme Court found that qualified immunity did not apply to employees of privately run prisons as the policy reasons which support the application of the doctrine to government officials would not‚ apply to those private employees. Specifically, the court found that in the administration of a privately run prison, competition and market forces obviated the need for immunity which traditionally has served to protect the public from unwarranted timidity on the part of public officials, as well as to encourage the vigorous exercise of official authority and principled and fearless decision-making. *Id.* at 2105–06. In deciding that immunity did not extend to privately employed prison officials, the court stressed that there was no ongoing direct state supervision and that the state had allocated the discretionary functions typically associated with prison administration, including prison discipline, parole, and good time credit, to governmental officials. *Id.* at 2107. In *McKnight*, the Court emphasized that its ruling that immunity did not apply to private persons was narrowly limited to the specific facts presented, and left open the question of whether qualified immunity would shield private parties in other circumstances. *Id.*, 117 S.Ct. at 2108. Specifically, the Court noted that immunity might apply to a private person "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision" as is the case in the present matter. *Id.* at 2108.

█ Under the reasoning of *McKnight*, the LSS defendants are entitled to invoke the doctrine of qualified immunity. The poli-

---

**1.** Because the court finds that defendants are entitled to qualified immunity, the court does not reach the question of whether absolute immunity applies.

cy reasons which support use of the doctrine by governmental officials involved in parental termination proceedings, apply equally to private individuals who are under contract with the State of Michigan to perform the same functions. Unlike the situation in *McKnight*, where the Court found that private market pressures would substitute for immunity by encouraging the vigorous exercise of official authority, the same could not be said in this case. In the case of prison administration, competition may well influence private officials to zealously exercise their authority. The threat that the State would cancel its contract with the private prison if it was not efficiently administered, may well counteract any timidity the private officials would exercise in their decision-making in order to prevent prisoner initiated lawsuits. The situation presented in this case is quite different.

Foster case workers making recommendations to the court about a parent's fitness to raise his or her own child have a special need for immunity. In contrast to the situation presented when a private firm undertakes the mammoth task of operating a penal institution for profit, this case involves private individuals performing a discrete public service task at the express direction and close supervision of governmental officials. LSS performs a similar function to the FIA. It contracts with FIA to provide all services which FIA provides, including overseeing foster homes, evaluating children and parents, providing therapy, and making recommendations to the court.

LSS is a non-profit organization. FIA supervisor Michael Roxberry testified at his deposition that FIA only purchases services from outside agencies when FIA cannot meet the particular needs of an individual child. (State's Exhibit 3, 29). Roxberry further testified that when the State purchases foster care services from an outside agency, the State assigns its own foster care worker to monitor the purchase services. (State's Exhibit 3, 38–39). He explained that the FIA case worker assigned to monitor the purchase services would evaluate the appropriateness of the plan for the child developed by the outside agency; would consult with the purchase caseworker about any problems they were experiencing; and, would try to assist in the delivery of service in general. (State's Exhibit 3, 38–39).

Moreover, in this case, Roxberry testified that he himself monitored and approved the case plan for plaintiff's child developed by LSS. (State's Exhibit 3, 43–44). LSS and FIA worked hand-in-hand on William's case. LSS relied on FIA's prior evaluations of William in formulating its own case assessment and plan. (State's Exhibit 15). Under these circumstances, there can be no doubt that LSS was serving as an adjunct to the FIA in the essential governmental activity of protecting wards of the State of Michigan. LSS operates under close and continuous official supervision, and essentially acts as the arm of the State.

In this case, the LSS defendants were charged with the difficult discretionary task of recommending to the State whether Bartell was fit to parent. Without immunity, the LSS defendants would not be free to make unbiased recommendations. Any time that they were to recommend that a parent's right to the care and custody of his or her child be terminated, they would face the risk of being sued. Faced with this threat, it would not be cost-effective for them to accept contracts with the State. Denying these individuals qualified immunity would deter them from assisting the State in performing an essential governmental function. If private non-profit foster care agencies were not available to contract with FIA, additional burdens would be placed on the State's limited budget.

Several circuits have extended qualified immunity to private actors under contract with the state to provide services in child custody matters. *See, e.g. Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405–06 (7th Cir.1993) (qualified immunity applied to private psychiatric center for detention of allegedly mentally ill patient at request of arresting officer); *Frazier v. Bailey*, 957 F.2d 920, 928 (1st Cir.1992) (qualified immunity applied to privately employed social workers who performed duties in investigation of suspected child abuse under contract to perform the duties statutorily required of

the state). Under these precedents, and the policy reasons discussed *supra*, qualified immunity extends not only to the State defendants, but to the LSS defendants as well.

■ Having determined that both the governmental and private officials sued in this lawsuit may assert qualified immunity, the court now turns to the question of whether defendants are in fact entitled to the defense as a matter of law. Qualified immunity is not simply a defense to liability on the merits, but is in fact "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Qualified immunity is purely a question of law for the court. *Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). When analyzing a qualified immunity issue, the court must first determine whether the plaintiff has shown a violation of a constitutionally protected right. *Megenity v. Stenger*, 27 F.3d 1120, 1124 (6th Cir.1994). If so, the second step is to determine whether the right is so "clearly established" that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

## B. *Federal Civil Rights Claims*

■ Against this backdrop, the court now analyzes plaintiff's federal civil rights claims, pled in counts I–III. She argues that defendants violated her constitutional right to parent her child. She further argues that the termination of her parental rights violates the Michigan Child Protection Act, MCLA § 722.620 *et seq.*, because there was no credible evidence of abuse or neglect. Plaintiff's claim that defendants violated the Michigan Child Protection Act is not cognizable in a § 1983, 1985(3) or 1986 suit. Section 1983 only authorizes courts to redress violations of "rights, privileges, or immunities secured by the [United States] Constitution and [federal] laws", and does not cover conduct that violates only state laws. *See Baker v. McCol-*

*lan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Similarly, § 1985(3) and § 1986 are limited to redressing violations of federal law. Plaintiff has not alleged any constitutional deficiency with the Michigan Child Protection Act. Thus, the court's analysis is limited to plaintiff's claim that her constitutional right to parent her child was violated.

■ Plaintiff is correct that the Supreme Court has ruled that natural parents have a fundamental liberty interest in the care, custody and maintenance of their children which is protected by the Due Process Clause of the Fourteenth Amendment. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Soc. Serv.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). There is no question that the Supreme Court has required procedural safeguards before parental rights may be terminated. *See Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unwed father entitled to hearing on parental fitness after natural mother died and children became wards of the state); *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388 (state must prove its allegations that a parent is unfit by "clear and convincing" evidence before parental rights may be terminated); *Lassiter*, 452 U.S. at 32, 101 S.Ct. 2153 (whether an indigent parent is entitled to counsel at a parental rights termination proceeding is to be decided by the trial court on a case-by-case basis); *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (distinguishing foster parents from natural parents in addressing process due before foster child is transferred). This liberty interest is not, however, absolute. The parent's interest must be balanced against the State's potentially competing *parens patriae* interest in preserving and promoting the welfare of the child. *Santosky*, 455 U.S. at 766, 102 S.Ct. 1388. The right to raise one's own children is not unfettered. The Supreme Court has plainly stated that "neglectful parents may be separated from their children." *Stanley*, 92 S.Ct. at 1213.

■ In this case, plaintiff has not alleged that defendants violated her due process

rights. Instead, she attempts to have this court review *de novo* the evidence presented to the Jackson County Probate Court at the parental rights termination hearing. This federal court does not sit as a state appellate court. Plaintiff had the opportunity to appeal Judge Vandercook's decision, but for some reason chose not to do so. This court's limited role in this matter is to determine if the defendants violated plaintiff's constitutional or federal rights in the parental termination proceedings, not to review that proceeding for evidentiary errors.

Plaintiff has not even alleged any deficiency in the process associated with her termination of parental rights. There is no question that plaintiff was afforded a hearing and appeared with counsel. Plaintiff claims that her equal protection rights were violated because she was treated differently than those with a higher IQ than her. Plaintiff's claim lacks merit. The Supreme Court has not recognized the disabled as a suspect class for purposes of equal protection analysis. *See, e.g. Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Moreover, as the court explained in its prior opinion, nothing in the Constitution or federal law would prevent the State from considering a parent's intelligence as one factor in determining his or her fitness to parent. It cannot be seriously disputed that raising one's children is an important and often difficult task which requires at least some minimal cognitive functioning. The level of intelligence needed to raise one's children will vary from case to case based on a myriad of factors including, of course, the child's particular circumstances. In this case, where plaintiff's child presented special needs based on his own developmental disabilities, the probate court found that plaintiff's low IQ, combined with her other emotional problems and past history of being unable to provide proper care to her son, required that her parental rights be terminated.

Contrary to plaintiff's allegations, nothing in the Constitution or the federal laws requires that the State ignore her disability in determining her fitness to parent. The Constitution simply does not protect individuals who are unfit to parent, either because of a disability or otherwise, from the termination of their parental rights. Because plaintiff has failed to show that any defendant violated her clearly established constitutional or federal rights, all of the remaining defendants are shielded from plaintiff's §§ 1983, 1985 and 1986 claims by the doctrine of qualified immunity.

Additionally, plaintiff's § 1985(3) conspiracy claim must be dismissed on other grounds as well. In order to bring a civil rights conspiracy claim under § 1985(3), plaintiff must show some racial, or perhaps otherwise class-based invidious discriminatory animus. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). This class-based animus is best understood in light of the historical circumstances surrounding the enactment of § 1985(3). When Congress enacted § 1985(3) during the Reconstruction period, its primary purpose was to combat discrimination perpetrated by the Ku Klux Klan against African Americans who had just been freed from slavery. *United Brotherhood of Carpenters and Joiners of America Local 610 v. Scott,* 463 U.S. 825, 836, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). In *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474 (7th Cir.1985), the court explained why § 1985(3) does not protect the handicapped:

> The legislative history of Section 1985(3) does not suggest a concern for the handicapped. The handicapped as a class differ radically from the racially-based animus motivating the Ku Klux Klan and white supremacists against which Congress directed Section 1985(3). Handicaps vary greatly from immediately noticeable physical handicaps to ones not at first obvious or those revealed only by a medical examination. Handicaps are also a condition that may be overcome, depending on the individual and on the handicap; likewise the severity with which a handicap affects a person varies from individual to individual.... Most importantly for a Section 1985(3) analysis, handicaps can be legitimate reasons for exclusion from some jobs—unlike discrimination based on race, ethnic origin, sex, religion or politics. This

distinction renders such discrimination less invidious.

*Id.* at 1486–87. Just as the *D'Amato* court explained that § 1985(3) would not protect the handicapped from all employment discrimination because disabilities, unlike race or sex, may be a legitimate reason for excluding an individual from a job, so too, a handicap may be a legitimate reason for terminating one's parental rights. Plaintiff has not cited any relevant authority in support of her claim that the handicapped are a class protected by the contours of § 1985(3). Accordingly, her § 1985(3) claim must be dismissed on these grounds as well.

### C. *Disability Discrimination Claims*

Immunity also shields defendants from suit against plaintiff's disability discrimination claims asserted under the Rehabilitation Act[2] and the ADA. Plaintiff's ADA claim is premised on the public accommodation provision set forth at 42 U.S.C. § 12182(a). Section 12182(a) provides:

**§ 12182. Prohibition of discrimination by public accommodations**

(a) General rule

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Plaintiff argues that she was denied a full and fair psychological evaluation and the benefit of in-home services to assist her with her handicapped son.

She further argues that she was denied appropriate in-home visitation with her son.

In evaluating whether immunity applies to plaintiff's disability discrimination claims, the question for the court is whether plaintiff has shown that her federal rights under the ADA and the Rehabilitation Act were violated.[3] In support of her claim, plaintiff relies on the affidavits of two clinical psychologists and her own deposition testimony. The clinical psychologists submitted affidavits critical of the psychological examination performed by VanGoethem, because it did not accommodate her intellectual limitations. As plaintiff is well-aware, this court dismissed VanGoethem by prior order. The affidavits do not appear to relate to any of the other defendants in this case. Plaintiff also relies on her deposition testimony wherein she stated that if someone had come to her house several times a week for a couple of hours to check up on her and William, she would have been able to care for her son. (Plaintiff's Exhibit 3, 184).

Defendants respond that plaintiff was not excluded from any services. She was provided visitation, transportation to visit her son, psychological evaluations, therapy, counseling and parenting classes. Defendants further respond that plaintiff has shown no services which were afforded to non-handicapped parents or parents of non-handicapped children to which she qualified and which were refused based on her handicap.

■ Defendants are entitled to qualified immunity as to plaintiff's ADA and Rehabilitation Act claims because plaintiff has failed to show that defendants violated a clearly established right of which they should have known.[4] As discussed in the court's July 11,

---

**2.** Plaintiff's claim under the Rehabilitation Act is substantially the same as her claim under the ADA. *See Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). In fact, both are alleged as one claim in Count IV.

**3.** Plaintiff argues that immunity does not apply under these Acts. As the court explained in its prior order dated July 11, 1997, qualified immunity does shield defendants from suit under the ADA or Rehabilitation Act. *See, e.g., Allison v. Department of Corrections*, 94 F.3d 494, 499 (8th Cir.1996); *Torcasio v. Murray*, 57 F.3d 1340,

1343 (4th Cir.1995), *cert. denied*, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996).

**4.** The LSS defendants argue that § 12132 does not apply to them because it only applies to public entities. The ADA defines "public entity" to include an "instrumentality of a state or local government." 42 U.S.C. § 12131(1)(b). Because the court already has found that LSS acted as the arm of the State of Michigan for immunity purposes, the court must reject the LSS defendants' argument that they are not a public entity within the meaning of the ADA.

1997, order, nothing suggests that it would be a violation of the ADA to consider an individual's disability in determining his or her ability to parent. As Judge Vandercook noted, plaintiff's mental deficiencies directly impacted her ability to parent her seven-year-old developmentally disabled son. The probate court found that plaintiff's own disabilities, including her mental limitations among other things, made it impossible for her to raise her son without jeopardizing his health and well-being. Contrary to plaintiff's allegations, the ADA does not require that the state develop psychological testing for plaintiff that accommodates her mental limitations in evaluating her ability to parent.

Moreover, plaintiff's claim that the ADA required that defendants send someone to her home to assist her and William is not supported by any law. It is not disputed that the State defendants and LSS defendants provided plaintiff with extensive assistance, including parent aides, parenting classes, and psychological therapy all towards the stated goal of reuniting plaintiff with her son. Moreover, LSS arranged for plaintiff to have unsupervised visits with her son, but later changed those visits to supervised only because plaintiff demonstrated that she was incapable of caring for William without assistance. Plaintiff's contention that she needed more assistance from defendants to care for her son, merely serves to buttress the decision of the probate court that plaintiff was unable to act as William's primary care-giver. In light of the overwhelming evidence that defendants provided plaintiff with extensive services all towards the stated goal of reuniting her with her son, her claim that she needed further assistance to properly parent William not provided for under Michigan or federal law, is wholly insufficient to support her claim that an ADA or Rehabilitation Act violation occurred.

## CONCLUSION

For the reasons discussed above, the nine moving defendants: (1) State of Michigan, (2) Family Independence Agency, (3) Lohiser, (4) Rein, (5) Roxberry, (6) Fett, (7) Kempter, (8) Okoronkwo, and (9) Lutheran Social Services are entitled to qualified immunity as to plaintiff's federal claims; thus, defendants' motions for summary judgment hereby are GRANTED as to counts I–IV.

All of the federal claims having been dismissed, the court declines to exercise supplemental jurisdiction over plaintiff's pendant state law claims, pled in counts five through seven, which hereby are DISMISSED pursuant to 28 U.S.C. § 1367(c).

Defendant Gerald Miller hereby is DISMISSED pursuant to Fed.R.Civ .P. 4(m) because he was never served with the summons and complaint.

SO ORDERED.