assessment of her intellectual disabilities, and appears to contend that Defendants did not reasonably accommodate her disability insofar as she was "deliberately denied [both] the services of a full and fair psychological evaluation" and the benefit of in-home services to assist her in raising William. Bartell's Br. at 33-34.

Bartell, however, has not alleged a genuine issue of material fact that she was denied custody of William because of her disability, or denied any accommodations because of her disability. *See, e.g., Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (holding that no ADA violation was shown because the disabled were not denied benefits that were otherwise available). Both Defendants and the Probate Court relied on wide-ranging evidence pertaining to Bartell's conduct, behavior, and history of abuse in terminating her parental rights. Moreover, Bartell essentially concedes that, prior to the termination decision, Defendants attempted to equip her with the skills necessary to care for William by providing parental aides, parental classes, and psychological therapy. Indeed, on appeal, Bartell does not even suggest that any services provided non-disabled persons were not provided to her. We therefore conclude that the district court did not err in granting Defendants qualified immunity on Bartell's ADA and Rehabilitation Act claims.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's grant of Defendants' summary judgment motions. Because we conclude that Defendants are entitled to qualified immunity on Bartell's claims, we need not address Dr. Van Goethem's and Woodbridge's absolute immunity claims. Accordingly, we **AFFIRM** the judgment of the district court in all respects.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0194P (6th Cir.)
File Name:  00a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ELLA BARTELL,
    *Plaintiff-Appellant,*

        *v.*                                    No. 98-1877

LORETTA LOHISER; GERALD REIN; MICHAEL ROXBERRY; LLOYD FETT; STATE OF MICHIGAN; MICHIGAN FAMILY INDEPENDENCE AGENCY, in the County of Jackson; PATRICIA KEMPTER; PATRICK OKORONKWO; LUTHERAN SOCIAL SERVICES, of Michigan; FRANK VAN GOETHEM; WOODBRIDGE BEHAVIORAL MANAGEMENT CONSULTANTS; GERALD MILLER,
        *Defendants-Appellees,*

SUSAN DEHNKE; COUNTY OF JACKSON; WOODBRIDGE PSYCHOLOGICAL CENTER,
        *Defendants.*

1

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 96-60416—Barbara K. Hackett, District Judge.

Argued:  August 6, 1999

Decided and Filed:  June 7, 2000

Before:  JONES, SILER, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**     David  R.  Parker,  CHARFOOS  &
CHRISTENSEN, Detroit, Michigan, for Appellant. Margaret
A. Nelson, OFFICE OF THE ATTORNEY GENERAL,
TORT DEFENSE DIVISION, Lansing, Michigan, Patrick D.
Filbin, RUTLEDGE, MANION, RABAUT, TERRY &
THOMAS, Detroit, Michigan, Patrick McLain, KERR,
RUSSELL & WEBER, Detroit, Michigan, Jeffrey C. Gerish,
PLUNKETT & COONEY, Detroit, Michigan, for Appellees.
**ON  BRIEF:**     David  R.  Parker,  CHARFOOS  &
CHRISTENSEN, Detroit, Michigan, for Appellant. Margaret
A. Nelson, OFFICE OF THE ATTORNEY GENERAL,
TORT DEFENSE DIVISION, Lansing, Michigan, Patrick D.
Filbin, Mary L. Dresbach, RUTLEDGE, MANION,
RABAUT, TERRY & THOMAS, Detroit, Michigan, Patrick
McLain, Joseph K. Grekin, KERR, RUSSELL & WEBER,
Detroit, Michigan, Jeffrey C. Gerish, PLUNKETT &
COONEY, Detroit, Michigan, for Appellees.

_____

**OPINION**
_____

   NATHANIEL  R.  JONES,  Circuit  Judge.    Plaintiff-
Appellant Ella Bartell brought the instant action against

*America v. Scott*, 463 U.S. 825, 829 (1983).  In *Browder v.
Tipton*, 630 F.2d 1149 (6th Cir. 1980), we held that § 1985(3)
only  covers  conspiracies  against:  1)  classes  who  receive
heightened protection under the Equal Protection Clause; and
2) "those individuals who join together as a class for the
purpose of asserting certain fundamental rights." *Id.* at 1150;
*see also Haverstick Enterprises, Inc. v. Financial Federal
Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994).

   Bartell's claim that Defendants discriminated against her on
account of her mental disabilities therefore is not actionable.
As noted earlier, the Supreme Court has not conferred suspect
or quasi-suspect status on statutory classifications covering
the disabled, *see Cleburne*, 473 U.S. at 442; *see also
Haverstick*, 32 F.3d at 994 (holding that "[n]o existing legal
precedent supports the plaintiffs' argument" that § 1985(3)
covers discriminatory conspiracies against the handicapped).
Further, Bartell has not alleged that Defendants harbored any
class-based  animus  toward  those  attempting  to  assert  the
fundamental right to parent, or any other fundamental right.
Accordingly,  Bartell  has  failed  to  state  a  claim  under
§ 1985(3).  Moreover, because her § 1986 claim is derivative
and conditioned on establishing a § 1985 violation, Bartell's
§ 1986 claim must also be dismissed.  *See Browder*, 630 F.2d
at 1155 (providing that there can be no violation of § 1986
without a predicate violation of § 1985); *Haverstick*, 32 F.3d
at 994 (same).

**C.**

   Without specifying the particular nature of her claims,
Bartell  additionally  asserts  that  Defendants  illegally
discriminated against her in violation of the ADA and the
Rehabilitation Act.    Because similar standards govern
Bartell's ADA and Rehabilitation Act claims, we will discuss
these contentions collectively. *See Andrews v. State of Ohio*,
104 F.3d 803, 807 (6th Cir. 1997); *Ventura v. City of
Independence*, No. 95-3582, 1997 WL 94688, at *1 n.2 (6th
Cir. 1997) (unpublished opinion).   Bartell alleges that
Defendants terminated her parental rights on the basis of their

**B.**

In addition to her substantive due process claim, Bartell asserts a number of other federal claims. Although not pled very well, she appears to assert a claim that the State's consideration of her intellectual disability violated the Equal Protection Clause of the Fourteenth Amendment. Because disability-based classifications do not involve either a suspect or semi-suspect class, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-43 (1985), the State's consideration of Bartell's disability is constitutional to the extent it is rationally related to the State's legitimate interest in the health and welfare of William. *See id.* at 440; *Cutshall v. Sundquist*, 193 F.3d 466, 482 (6th Cir. 1999). Because LSS and FIA considered Bartell's intellectual incapacities along with a variety of other factors pertaining to her parental fitness, we conclude that this measured consideration of the relationship between Bartell's disability and William's welfare falls within the broad bounds of rational basis review. *See Borman's Inc. v. Michigan Property & Casualty Guaranty Assoc.*, 925 F.2d 160, 162 (6th Cir. 1991) (noting the substantial deference afforded to state action under rational-basis review).

We also reject Bartell's claim that the district court erred in granting Defendants qualified immunity on Bartell's statutory claims. Bartell has no actionable claim under § 1985(3) because it does not cover claims based on disability-based discrimination or animus. To assert an actionable claim under § 1985(3), a claimant must show that: 1) the defendants conspired "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 2) the defendants committed acts that deprived the claimant "of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3); *see Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). The Supreme Court has emphasized that § 1985(3) requires *inter alia* that a claimant establish "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *United Brotherhood of Carpenters and Joiners of*

Defendants-Appellees Michigan Family Independence Agency ("FIA"), Lutheran Social Services of Michigan ("LSS"), and others, asserting that they violated various federal and state laws in terminating her parental rights to raise her son. The district court ultimately granted Defendants' motions for summary judgment, holding that they were shielded from liability by the doctrine of qualified immunity. Bartell now appeals these rulings, and for the reasons that follow, we **AFFIRM** the district court's judgment.

**I.**

Bartell is the biological mother of William John Stanley, who was born on August 20, 1987, and suffers from a number of physical and psychological challenges. Sometime in 1988 or 1989, Bartell contacted Michigan's Family Independence Agency ("FIA") for assistance in dealing with William's aggressive and hyperactive behavior, and FIA responded by providing Bartell with parental aides. In the early 1990s, local authorities began investigating Bartell after receiving complaints that she and her husband were engaging in violent fights, and that Bartell was abusing her children. While acknowledging marital problems, Bartell denied that she physically or verbally abused her children. *See Bartell v. Lohiser*, 12 F.Supp.2d 640, 642 (E.D. Mich. 1998).

In 1992 and 1993, Bartell suffered through bouts of depression and was hospitalized after a suicide attempt. After being released from the hospital, Bartell continued to receive treatment for her physical and mental ailments. Simultaneously, William's behavior became increasingly uncontrollable, and in August 1993, Bartell voluntarily placed him in the Chelsea Home for Boys. William stayed at the Chelsea Home for approximately one year, when his behavior proved more than the Home could handle. Toward the end of his stay at Chelsea, William was hospitalized at the University of Michigan's Children's Psychiatric Unit to receive more specialized care. Thereafter, the Chelsea Home

discharged William because of his hospitalization and its inability to contain his behavior. *See id.*

After William's discharge from the Chelsea Home, Bartell agreed to FIA's suggestion that she voluntarily place him in foster care. Bartell believed that William's placement in foster care would be temporary, and that she would re-assume his care when she was better able to do so. *See id.* Given William's unique behavioral and psychological challenges, FIA placed William in the care of LSS, which contracted with FIA for the provision of foster care services. During this period, Defendants Patricia Kempter and Patrick Okoronkwo, both LSS caseworkers, worked closely on William's case.

During William's voluntary placement in foster care, FIA asserts that Bartell visited William erratically and that his behavior became agitated and uncontrollable during her visits. Claiming that she had sufficiently resolved her psychological maladies to re-assume her son's care, Bartell asked to resume custody of her son in December 1994. *See id.* at 642-43. Shortly thereafter, Lohiser and FIA initiated custody proceedings in Jackson County Probate Court, asserting that William's behavioral and emotional disorders, coupled with Bartell's mental and emotional problems, prevented her from providing the care William needed. The Probate Court denied FIA's request, and Bartell was re-united with William on March 1, 1995. The next day, however, FIA filed a second petition to place William in temporary custody. On March 9, 1995, the Probate Court granted the petition and thereby continued William's temporary out-of-home placement. In granting the petition, the court concluded that the out-of-home placement was necessary to protect William from a substantial risk that he would be mentally or physically harmed while in Bartell's care.

The Probate Court conducted four hearings between September 1995 and April 1996 to review William's case and to assess whether William should be re-united with his mother. While Bartell claims that she complied with LSS' requirements that she attend parenting classes, receive

skills are undoubtedly relevant, at some level, to the ability of a parent to raise her child, the State must make a specific and tangible showing, not a presumptive one, on the precise nature of the links between these capacities and a particular child's needs. *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) (holding that narrow-tailoring requires a state to act with "precision" and to use the least restrictive means of achieving its compelling interest).

In this case, Dr. Van Goethem's report is filled with vague and subjective appraisals of Bartell's faculties that are not empirically linked to her ability to attend adequately to William's needs. While Bartell's eloquence may not rival Winston Churchill, and the breadth of her vocabulary may not challenge Oliver Wendell Holmes, her constitutional right to parent her child may not be abrogated on these tenuous grounds. To the extent that a parent's intelligence level may legitimately inform a State's assessment of whether parental rights may be terminated, the Constitution at least requires the State to establish empirically that the kinds of intelligence most necessary to caring for a particular child are deficient in that parent. *See id.* Bartell's low verbal IQ test score, which drives many of Dr. Van Goethem's findings, fails this test. Neither Dr. Van Goethem nor Defendants have made a specific and empirical showing that the verbal IQ test measures the kinds of intelligence that are indispensable to the ability of Bartell to care for her child. Without such a showing, the State cannot demonstrate that terminating Bartell's parental rights on the basis of her mental disabilities was necessary to protect William's well-being.

Accordingly, we underscore that our holding does not rest on the State's characterizations of Bartell's intellectual disabilities, but on its specific findings pertaining to Bartell's history of both receiving and delivering abuse, depression, suicide attempts, pathological conduct, and her ultimate inability to control a child who presents unique behavioral and psychological challenges. Based on these findings, we hold that Bartell has not demonstrated that her parental rights were terminated in contravention of the Due Process Clause.

the health and safety of William and whether the particular means employed were narrowly tailored to achieve that end. *See Glucksberg*, 521 U.S. at 721.

Bartell asserts, and the record provides, that LSS' decision to pursue termination proceedings was partially motivated by its concern that William needed a caretaker with "special skills to meet his special needs." J.A. at 942. In particular, LSS, FIA and the Probate Court relied heavily on Dr. Van Goethem's evaluation of Bartell, in which he found that she was "intellectually limited" because she "was not very articulate," had "a limited vocabulary," and scored 74 on the verbal IQ test. J.A. at 113-115. Based on these findings, Dr. Van Goethem "seriously question[ed] if Ms. Bartell ha[d] the intellectual and necessary emotional resources to provide optimal parenting for the children." J.A. at 119. Bartell contended that her emotional problems and abusive relationships were in her past, and that she was prepared to care for William at the time her parental rights were terminated.

Given the entire record concerning Bartell's capacity to provide for her son, we hold that the State did not violate her fundamental right to raise William in terminating her parental rights, and therefore the district court properly granted Defendants qualified immunity on this claim. We reach this holding based upon the district court's findings pertaining to Bartell's suicide attempts, emotional instability, depression, inability to control William's behavior, involvement in abusive relationships, pathological behavior, and allegations of child abuse. In concluding that FIA's and LSS' actions were constitutionally justified on balance, we emphasize that their appraisal of Bartell's mental disabilities was an insufficient predicate for abrogating her parental rights.

Specifically, both the district court and Defendants place significant credence on Dr. Van Goethem's evaluation of Bartell's "limited" intelligence level, *see Bartell*, 12 F.Supp.2d at 648, which is purportedly manifested by her low verbal IQ test score. While critical thinking and reasoning

therapy, and visit with her son, LSS reported that Bartell had difficulty controlling her son on her visits and was unable to attend to him without the assistance of relatives. *See id.* Due to these findings, Bartell's visitation privileges were reduced from unsupervised to supervised.

In early 1996, LSS petitioned to have Bartell's parental rights terminated, and on May 15, 1996, the Probate Court held a hearing on this issue. Among other evidence, LSS proffered an examination of Bartell performed by Dr. Frank Van Goethem. Dr. Van Goethem's report provided that Bartell was "intellectually limited" because she "was not very articulate," had "a limited vocabulary," and scored 74 on the verbal IQ test. J.A. at 113-115. Van Goethem also found that Bartell suffered from dependent personality disorder, serious depression, low self-esteem, and self-abusive, pathological behavior. *See Bartell*, 12 F.Supp.2d at 643-44. Based on these findings, Van Goethem concluded that it was "unwise to reunite Ms. Bartell with her children" and that he "seriously question[ed] if Ms. Bartell ha[d] the intellectual and necessary emotional resources to provide optimal parenting for the children." J.A. at 119. A second evaluator, psychologist Gary Rutledge, also opined that Bartell was unable to care properly for William.

Bartell countered Van Goethem's and Rutledge's reports with affidavits from clinical psychologists Carolyn Moore-Newberger and Paul Jacobs. Both criticized Van Goethem's evaluation, stating that "his entire evaluation reflects his discrimination and bias" against Bartell, and that it "was grossly inadequate, completely inaccurate and was not based on any data which was gathered, verified and analyzed by Mr. Van Goethem." J.A. at 307, 312.

Notwithstanding the reports of Moore-Newberger and Jacobs, the Probate Court granted LSS' petition, concluding that Bartell "fail[ed] to provide proper care and custody for William and there is no reasonable likelihood that she will be able to provide proper care and custody within a reasonable time." J.A. at 216. The court further concluded that there

was a "reasonable likelihood" that William would be harmed by the mental and emotional incapacities of his mother, and that irrespective of Bartell's benign intentions, this potentiality legally required that her parental rights be terminated. *See* J.A. at 216.

While Bartell did not appeal the Probate Court's ruling, she did file the instant seven-count federal Complaint against FIA, LSS, Jackson County, Van Goethem, and various LSS and FIA personnel. Bartell alleged federal claims under 42 U.S.C. §§ 1983, 1985 and 1986 (Counts I-III); the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794 (Count IV). She additionally asserted state claims for negligence and intentional infliction of emotional distress (Count V, VII), and breach of the Michigan Handicappers' Civil Rights Act, M.C.L.A. § 37.1101 (Count VI). Bartell thereafter stipulated to the dismissal of Defendants Susan Dehnke, Jackson County, and Woodbridge Psychological Center. The remaining Defendants subsequently filed motions for summary judgment.

The district court granted these motions, concluding that the doctrine of qualified immunity shielded the remaining Defendants from suit for their actions. The district court ruled that although Bartell undoubtedly has a constitutional interest in caring for her child, that right is not absolute given the State's concurrent interest in the health and welfare of children in its jurisdiction. *See Bartell*, 12 F.Supp.2d at 647. Apparently responding to a procedural Due Process Claim, the district court noted that Bartell had not alleged a deficiency either in the administrative process or the processes before the Probate Court. Without specifically resolving the clash of the substantive liberty interests at stake, the district court granted Defendants qualified immunity on Bartell's due process claim. The district court also rejected Bartell's equal protection claim, holding that the Probate Court did not violate constitutional norms by incorporating Bartell's intelligence level into its custody determination. *See id.* at 648. After concluding that the State did not err in

objectively unreasonably in light of the clearly established right. *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

## A.

It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child. *See Michael H. v. Gerald D.*, 491 U.S. 110, 119-123 (1989); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 200 (6th Cir. 1987). Although the parties fail to fully appreciate this distinction, the differences between the procedural interest in raising one's child and the substantive right, and the corresponding scope of the duties imposed on government, are significant. While procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests, *see Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976), substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Here, Bartell has not alleged that the process she was afforded failed to comply with constitutional standards, and we will therefore confine our analysis to her substantive due process claim.

This is a path we do not lightly tread. Although Bartell has a fundamental right to raise her son, the State has a concomitant interest in the welfare and health of children in its jurisdiction, and in certain narrowly-defined circumstances, the State's interest in a child's well-being may supersede that of a parent. *See Santosky v. Kramer*, 455 U.S. 745, 766-67 (1982); *see also Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (recognizing that because the State has cognizable interests in the safety of children in its jurisdiction, "neglectful parents may be separated from their children"). In determining the constitutional legitimacy of FIA's and LSS' actions, we must assess whether they were acting to ensure

Here, the LSS defendants direct a non-profit operation that is closely supervised by FIA. Bartell does not dispute the district court's findings on the extent of involvement by FIA in the activity of LSS. The court found that FIA only purchases private foster care services when it cannot meet the needs of a particular child. *See Bartell*, 12 F.Supp.2d at 646. Additionally, FIA appoints a caseworker to monitor the appropriateness and sufficiency of LSS' foster care plans, and in this case, a FIA caseworker specifically approved of LSS' plans for William. *Id.* Moreover, the purposes of qualified immunity apply with particular force to the foster care services provided by LSS. Decisions pertaining to the welfare of a child, which may, as in this case, result in the termination of the natural bond between parent and child, require the deliberate and careful exercise of official discretion in ways that few public positions can match. The necessity that this delicate process not be over-burdened with encumbering litigation comports entirely with the *Harlow* Court's formulation of the purposes of qualified immunity protection. Accordingly, because of the closely monitored, non-profit interrelationship between FIA and LSS, we hold that the LSS defendants may assert qualified immunity.

### III.

Bartell further contends that even to the extent the LSS defendants may assert qualified immunity, the district court erred in granting summary judgment because both the LSS and FIA defendants violated her clearly established constitutional and statutory rights. Bartell alleges that Defendants terminated her custody of William on the basis of her mental disabilities, and to that extent, violated her clearly established constitutional rights to due process and equal protection, in addition to her statutory rights under the ADA, the Rehabilitation Act, and §§ 1983, 1985, and 1986.

We apply a two-step analysis to determine whether qualified immunity is proper: first, we determine whether a "clearly established" constitutional or statutory right has been violated; and second, we ascertain whether the official acted

considering Bartell's limited intellectual capacity in assessing Bartell's parental fitness, the district court additionally denied Bartell's ADA and Rehabilitation Act claims. With these rulings, the district court granted Defendants qualified immunity on all of Bartell's federal claims, and after declining to exercise pendent jurisdiction, dismissed Bartell's state law claims. Bartell now appeals the district court's grant of Defendants' summary judgment motions.

### II.

We review the district court's grant of Defendants' summary judgment motions *de novo*. *See Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir. 1996); *see also Spurlock v. Satterfield*, 167 F.3d 995, 1000 (6th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Terry Barr*, 96 F.3d at 178. No genuine issue for trial exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Moreover, we must review the record, and any inferences derived therefrom, in the light most favorable to the party opposing the motion. *See id.*

### A.

Bartell first asserts that qualified immunity is unavailable to LSS and the LSS individual defendants [hereinafter "LSS defendants"] because they are "non-governmental actors."[1]

---

[1] Bartell also contends that under the ADA and the Rehabilitation Act, Congress specifically abrogated qualified immunity protections for states and state agencies. However, this Circuit, as well as a number of our sister Circuits, have granted state employees qualified immunity against ADA and Rehabilitation Act claims. *See Stigall v. Lewis*, No. 97-5301, 1999 WL 183392, at *2 (6th Cir. Mar. 16, 1999) (unpublished

Bartell's Br. at 24. Specifically, relying on the Supreme Court's holding in *Richardson v. McKnight*, 521 U.S. 399 (1997), Bartell contends that the purposes of affording state-affiliated actors qualified immunity are inconsistent with granting the LSS defendants qualified immunity, and that the district court therefore erred in dismissing her claims.

It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting "under the color of state law" for the purposes of § 1983. *See Wyatt v. Cole*, 504 U.S. 158, 162 (1992); *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 929, 938-39 (1982); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978). In assessing whether the qualified immunity afforded state officials extends to private actors who are considered state actors under § 1983, we must consider both the purposes of qualified immunity protection and the nature of the relationship between the state and the putative private party. *See Richardson*, 521 U.S. at 404.

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Within the context of allowing private parties to vindicate their right to be free from § 1983 infractions, the animating purpose of the Supreme Court's articulation of qualified immunity standards in *Harlow* is to allow public officials to perform important government functions free from the debilitating effects of excessive litigation. *See id.*; *Wyatt*, 504 U.S. at 166. In limiting a

---

opinion); *Allison v. Department of Corrections*, 94 F.3d 494, 497-98 (8th Cir. 1996); *Torcasio v. Murray*, 57 F.3d 1340, 1343 (4th Cir. 1995); *McGregor v. Louisiana State Univ. Bd. of Spvrs.*, 3 F.3d 850, 862 (5th Cir. 1993); *P.C. v. McLaughlin*, 913 F.2d 1033, 1038-41 (2d Cir. 1990). Accordingly, Bartell's claim that qualified immunity is not available for ADA and Rehabilitation Act claims is without merit.

public official's personal liability to objectively unreasonable violations of clearly established law, the *Harlow* Court was expressly concerned that numerous lawsuits would distract government officials from performing their functions, would inhibit discretionary action, and would deter desirable candidates from performing public service. *See Harlow*, 457 U.S. at 816.

In *Wyatt* and *Richardson*, the Supreme Court refined *Harlow*, holding that a private party may not assert qualified immunity when the incentives for a particular government function are fundamentally inconsistent with the foregoing purposes of qualified immunity protection. *See Wyatt*, 504 U.S. at 167 (providing that "the special policy concerns" that underlie qualified immunity protections are critical to determining whether its protections are available); *Richardson*, 521 U.S. at 404 (same). Specifically, in *Richardson*, the Court ruled that employees of a privately run, for-profit prison that had contracted with the State for the provision of penological services could not assert qualified immunity. The *Richardson* Court concluded that the prevailing economic incentives in the market for privately provided penological services were sufficiently strong to essentially render qualified immunity protection superfluous. *See Richardson*, 521 U.S. at 409-410.

In this context, the Court found that "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance," and that to this extent, the prison employees were more akin to private workers than public officials. *Richardson*, 521 U.S. at 410. However, in denying the prison employees' attempt to assert immunity, the Court emphasized that the prison was operated for-profit and with "limited direct supervision by the government." *Id.* at 413. In this regard, the Court distinguished the situation it faced from a private individual "serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Id.*