Sylvia **RODRIGUEZ**, individually and on behalf of her minor child, Les Andrew Kelly, Plaintiffs,

v.

Marjorie **McLOUGHLIN**, individually and as Executive Director of Cardinal McCloskey Children's and Family Services, Barbara McMurray, individually and as Foster Boarding Home Director of Cardinal McCloskey Children's and Family Services, Cardinal McCloskey Children's and Family Services, New York City Department of Social Services, New York City Child Welfare Administration, and the City of New York, Defendants.

No. 96 Civ.1986(KMW).

United States District Court, S.D. New York.

Jan. 8, 1999.

Howard Seife, Elyse C. Pepper, Winston & Strawn, New York, NY, for Plaintiff.

Eleanor. N. Flach, Capriano Lichtman & Flach, New York, NY, for Defendants Barbara McMurray, Cardinal McCloskey Children's and Family Services, Marjorie McLoughlin, Barbara McMurray.

Frances Sands, Paul A. Crotty, Corporation Counsel of the City of New York, New York, NY, for Defendants New York Dept. of Social Services, New York City Child Welfare Admin., City of New York.

## AMENDED OPINION and ORDER

KIMBA M. WOOD, District Judge.

This action arises out of Cardinal McCloskey Children's and Family Services's ("McCloskey") removal of a former foster child, Les Andrew Kelly ("Andrew"), on an alleged emergency basis from the home of his former foster, now adoptive, mother, Sylvia Rodriguez, on March 18, 1994. Sylvia Rodriguez, individually and on behalf of her son Andrew, alleges under 42 U.S.C. § 1983 that the removal of Andrew violated their right to procedural due process guaranteed by the Due Process Clause of the Fourteenth Amendment because (1) the circumstances of Ms. Rodriguez's foster children, Andrew and his foster brother Thomas Green, on March 18, 1994 did not justify an emergency removal, and therefore she was entitled to notice and an opportunity to be heard prior to their removal, (2) Ms. Rodriguez was not provided with either adequate post-removal notice or opportunity to be heard to contest the removal, and (3) Ms. Rodriguez was not provided an adequate opportunity to be heard to contest the denial of her request to visit Andrew. Defendants move to dismiss the complaint with prejudice, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Defendants' motion presents the Court with a series of novel and difficult questions concerning the scope and character of the procedural protections of the Due Process Clause of the Fourteenth Amendment in the context of an alleged emergency removal of a child from a New York foster mother who was in the final stages of adopting her foster child, whom she had cared for continuously since his first weeks of infancy. As explained in the discussion below, the Court holds that there is a constitutionally protected liberty interest in the stability and integrity of the relationship between such a foster mother and foster child. Further, the Court also holds that the delay in providing Ms. Rodriguez with notice and an opportunity to be heard to contest (1) the removal and (2) the denial of Ms. Rodriguez's request to visit Andrew for approximately three months following the removal violated the Due Process Clause's fundamental requirement that an aggrieved party be provided with an opportunity to be heard " 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)); *see Brock v. Roadway Express*, 481 U.S. 252, 261, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (quoting same). However, the Court grants defendants' motion, which it treats as a motion for summary judgment, as to plaintiff's claims that there was no basis for emergency removal.

Finally, the Court hereby vacates its earlier Order of September 15, 1998 in this case solely as to its decision to grant the individual defendants qualified immunity.

### I. *Background*

To address Ms. Rodriguez's constitutional claims, it is necessary to understand the circumstances of Ms. Rodriguez's foster care relationship with Andrew from its inception through Andrew's return to Ms. Rodriguez's care subsequent to his removal on March 18, 1994. Except as otherwise noted, the Court finds there is no genuine issue as to these facts.

Andrew was born on March 15, 1990; his biological mother abandoned him immediately following his birth. Thirteen days after his birth, McCloskey, the authorized foster care agency for the City of New York, placed Andrew in the certified foster home of Ms. Rodriguez pursuant to a foster family agreement between McCloskey and Ms. Rodriguez. Andrew lived continuously with Ms. Rodriguez for his first four years until McCloskey removed Andrew from Ms. Rodriguez's residence on March 18, 1994.

Prior to Andrew's removal, McCloskey caseworkers and administrators viewed Ms. Rodriguez as an affectionate and caring foster parent who consistently provided for Andrew's basic needs. Venton Monplaisir, the McCloskey caseworker responsible for Andrew's case through March 18, 1994, observed that a strong bond had formed between Ms. Rodriguez and Andrew, that Ms. Rodriguez ably provided for his needs, and that Andrew called Ms. Rodriguez "Mommy" and depended on her as such. McCloskey case worker notes reveal that Andrew had limited contact with his biological mother, meeting her only a few times in his first three years. By January 21, 1992, McCloskey had determined that it would not be in Andrew's best interest to return to his biological mother, and that the permanent goal for Andrew was adoption. By that time, McCloskey considered Ms. Rodriguez as a possible adoptive parent for Andrew. Mr. Monplaisir believed that adoption by Ms. Rodriguez was a good option for Andrew. In McCloskey's October 26, 1993 Annual Recertification Study for Ms. Rodriguez, McCloskey noted that there was "very little chance of abuse or neglect; foster mother knows the dangers and will not subject the children consciously." (Pl. Exh. 29 at CM 01225.) The report also noted that Ms. Rodriguez "has available resources of neighbors and family members, however, she must be willing to

trust people and be more positive," and "recommend[ed] that she test. her neighbors so that she could use them to baby sit more often." (*Id.* at CM 01228.)

A family court order dated June 25, 1993 terminated Andrew's biological mother's parental rights; legal custody over Andrew was then transferred to McCloskey. On August 9, 1993, Ms. Rodriguez and McCloskey entered into an Adoptive Placement Agreement. In November 1993, McCloskey reported to the New York Child Welfare Administration ("CWA"), that its new goal for Andrew was to finalize Ms. Rodriguez's adoption. All the paperwork involved in Ms. Rodriguez's adoption application was filed before the March 18, 1994 removal from her home; McCloskey reported to CWA that at the time of his removal, McCloskey was awaiting the conclusion of the adoption finalization process.

On March 18, 1994, Ms. Rodriguez was the foster mother not only for Andrew, but also for Thomas Green, who was then three years old. Ms. Rodriguez's grandson, Edwin Rodriguez, was also living with her. Edwin was twelve years old on March 18, 1994 and a student in special education at P.S. 75 in Queens. On March 18, 1994, when Mr. Monplaisir arrived at Ms. Rodriquez's home for a scheduled visit, he found only Edwin supervising Andrew and Thomas. Mr. Monplaisir, the only direct witness to the state in which he found Edwin, Andrew, and Thomas testified at deposition:

I believe Les Andrew Kelly answered the door. Thomas Green, Andrew Kelly and Edwin, who is alleged to be her grandson, was at home. Ms. Rodriguez was not in that house.... I did have a concern, and I questioned [Edwin] on why he wasn't in school that day. And I was there for some time, and my question was who are you here with or who's supervising the kids. He appeared to be having some difficulty managing the two kids there on his own, and he had said something about someone next door or someone across the hall looking after them or something, but they weren't in the home the entire time that I was there.

So I did go over to the neighbor's apartment and questioned them in terms of if they were, indeed, babysitting or watching after the kids ... one person told me something about well, they can always knock on my door if it's an emergency ... [E]ven after I questioned them, no one took the initiative to come over to the apartment, because that was the question at hand[.][B]ut then there was another individual, a young lady in that home who seemed at to be pretty concerned that questioned me if Ms. Rodriguez would get in trouble for the kids being left alone. But then still no one ... no one took the responsibility of coming back over to the apartment to stay with the children. So, as a result, I ended up staying at the apartment.

Then Ms. Rodriguez's daughter came by while I was there. So I kind of figured well, I'd ask her maybe she's going to supervise the children there, but she wasn't concerned about staying there. She was just coming to get something and to get out. She had some appointment somewhere else.

And then once again, the kids are running all over the place, and I could see that Edwin was having [a] difficult time managing them, during the time I was there. I mean I noticed he did try to ... put something together for them to eat. And I felt he was in a really bad situation because I felt a little overwhelmed, and then at one point I believe when I was walking around the apartment, both Andrew Kelly and Thomas Green ran out in the hallway, making— yelling, laughing, whatever. When I finally notice they weren't in the apartment, when I ran out in the hallway, they were right at the top of the stairs, which are some pretty steep steps of stone, and I got really worried and concerned about that, and I then ran out-

side and had them come back in the apartment. . . .

I know I was there for at least two hours. . . . I then contacted the agency and spoke to the administrator.

(Def. Exh. N. at 198–202.) Mr. Monplaisir left Ms. Rodriguez's apartment to contact his supervisor. Before he left to contact his supervisor, Mr. Monplaisir also observed Edwin trying to clean the children, but he did not recall whether he was bathing them, or merely washing their faces. (*Id.* at 203.) Mr. Monplaisir testified that Edwin "was having a very difficult time . . . he appeared to me to be very overwhelmed and very worried and concerned that I was then there without his grandmother, but he appeared to me to be very overwhelmed." (*Id.* 204–05.) Because Mr. Monplaisir's supervisor was not available, he spoke with Barbara McMurray, director of McCloskey's foster boarding home, who in turn contacted his supervisor. Ms. McMurray instructed Mr. Monplaisir to return to Ms. Rodriguez's apartment and stay with the children. After returning to Ms. Rodriguez's apartment, Mr. Monplaisir was instructed by his supervisor to remove Andrew and Thomas from Ms. Rodriguez's home, which he did.[1]

On the morning of March 18, 1994, Ms. Rodriguez was away from her home because she had a scheduled court appointment regarding the custody of Edwin. Ms. Rodriguez alleges that on that morning she had arranged for her neighbor, Myra Aponte, to baby-sit Andrew and Thomas while she was in court. Ms. Rodriguez maintains before leaving her apartment building on the morning of March 18, 1994, she informed another neighbor, Harriet Bentley, that Ms. Aponte had taken her own children to school, and would return within 10–15 minutes to care for Andrew and Thomas. Ms. Rodriguez also asserts that Ms. Bentley did check in on

Ms. Rodriguez's apartment while Mr. Monplaisir was with the children, to make herself available to them in event of an emergency, which she told Mr. Monplaisir. Ms. Rodriguez's position is that she left Andrew and Thomas in the care of Edwin because she expected Ms. Aponte to return to the children momentarily. Ms. Rodriguez contends that Edwin was capable of feeding, bathing, and taking care of Andrew and Thomas. Ms. Rodriguez claims that Edwin's status as a student in special education does not adequately convey his capacities taking care of Andrew and Thomas. Ms. Rodriguez also points out that two of her neighbors were baby-sitters certified by McCloskey. Defendants dispute Ms. Rodriguez's depiction of the arrangements that she had in place on the morning of March 18, 1994 and Edwin's ability to care for Andrew and Thomas.

McCloskey made arrangements for Andrew's and Thomas's transfer to another foster home contemporaneously with their removal. On March 18, 1994, McCloskey did not provide Ms. Rodriguez with written notice of Andrew's removal, as it would have if the removal had been planned. When Ms. Rodriguez telephoned McCloskey upon her return from court to find out what had happened, she received notice that McCloskey had removed Andrew and Thomas. On or about the day of Andrew's removal, McCloskey submitted a Report of Suspected Child Abuse or Maltreatment to the New York State Central Registry. Thereafter, CWA's Office of Confidential Investigations ("OCI") commenced an investigation into the circumstances surrounding Andrew's removal.

In a letter dated March 31, 1994, a staff attorney from Bronx Legal Services, Nanette Schorr, wrote to McCloskey on Ms. Rodriguez's behalf requesting that visita-

---

1. In the fall of 1993, two anonymous complaints were filed concerning Ms. Rodriguez's care for her foster children; in December 1993 the Office of Confidential Investigations of CWA determined that these complaints were unfounded. McCloskey was aware of this determination, and according to Ms. McMurray, these complaints were not a factor in McCloskey's decision to remove Andrew and Thomas.

tion be set up immediately. On April 6, 1994, McCloskey responded that OCI had not completed its investigation, and that while the OCI investigation is pending, McCloskey was evaluating whether visitation would be in the best interest of the child. Ms. Rodriguez subsequently applied for an Independent Review and a Fair Hearing concerning the removal of Andrew. McCloskey believed that its charges of neglect against Ms. Rodriguez would be confirmed by the OCI investigation. In a handwritten Report dated April 19, 1994, OCI determined that there was no credible evidence to support the charges of neglect against Ms. Rodriguez, and concluded that the Report of Suspected Child Abuse or Maltreatment was unfounded. The OCI report directed training for Ms. Rodriguez in the area of the proper supervision of foster children. OCI sent a copy of its Report to McCloskey on June 20, 1994. The parties dispute whether McCloskey had information about OCI's conclusion as early as May 27, 1994. (*See* Pl. 56.1 ¶¶ 105–07; Def. Resp. 56.1 ¶¶ 105–07.)

Before OCI sent a copy of its report to McCloskey, Dr. Lawrence Fantl, McCloskey's in-house psychologist, conducted an examination of Andrew, on June 13, 1994, to evaluate Andrew's adjustment to his new foster home and to assist McCloskey in determining what was in Andrew's best interest. Dr. Fantl concluded, among other things, that Andrew was adjusting well to his new foster home. On June 15, 1994, a scheduled Fair Hearing was adjourned until July 13, 1994 because the Administrative Law Judge determined that an Independent Review should be conducted first. On June 15, 1994, McCloskey sent Ms. Rodriguez written notice of removal of Andrew from her home. On June 15, 1994, Ms. Rodriguez's attorney again requested that Ms. Rodriguez be allowed to visit Andrew.

Ms. Rodriguez was permitted to visit Andrew for the first time on June 27, 1994. An Independent Review Hearing was conducted on June 28, 1994. On July 8, 1994, a second visit between Ms. Rodriguez and Andrew took place. McCloskey reported to CWA that these two visits "were closely supervised by the social worker and the child appeared to be very attached to Ms. Rodriguez, [who] was also very affectionate with the child...." On July 11, 1994, CWA rendered its decision on Independent Review and ordered McCloskey to return Andrew to Ms. Rodriquez's care. In its decision, CWA noted that McCloskey's decision not to allow "visiting during the OCI investigation ... seemed curious since the child would not have been endangered by the visits per se," and that this decision was questionable in view of the fact that "visiting could have helped the child's understanding of the situation." (Pl. Exh. 35 at CM 01755.) The Independent Review further concluded that following a ninety day period of close supervision, "the adoption process should be reinitiated." (*Id.*) On July 12, 1994, Ms. Rodriguez's counsel withdrew her request for a Fair Hearing in view of the fact that Ms. Rodriguez had succeeded at Independent Review in restoring Andrew to Ms. Rodriguez's care.

Andrew's adoption process resumed January 4, 1995. Ms. Rodriguez's adoption of Andrew was finalized on August 17, 1995.

## II. *Discussion*

### A. *The Standard*

Rule 12(b) of the Federal Rules of Civil Procedure provides that if matters outside the pleadings are presented to the Court, and the Court does not exclude that evidence, the motion shall be treated as one for summary judgment and "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In this case, there has been extensive discovery, and prior to permitting defendants' motion, the parties exchanged extensive Local Civil Rule 56.1 Statements. These Statements assert, in detail, the facts each party views as material to defendants' motion, and ap-

pend portions of the documentary record to support each statement. The Court then held a conference to review these statements and evaluate the utility of a summary judgment motion. Thus, both parties have had an opportunity to present pertinent facts raised by defendants' motion, and the Court treats defendants' motion as a motion for summary judgment under Rule 56. *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1052–53 (2d Cir.1995) (essential inquiry is whether non-movant should reasonably have recognized possibility that motion might be treated as one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings).

On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987) (citations and internal quotation marks omitted). To prevail on a motion for summary judgment, the moving party therefore must show that there are no such genuine issues of material fact to be tried, and that he or she is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Citizens Bank v. Hunt*, 927 F.2d 707, 710 (2d Cir.1991). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," which includes identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Once a motion for summary judgment is made and supported, the non-moving party must set forth specific facts that show that there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although a court considering a motion for summary judgment must view all evidence in the light most favorable to the non-

moving party, and must draw all reasonable inferences in that party's favor, *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If, based on the submissions to the court, no rational fact-finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

■ Title 42, United States Code § 1983 provides a federal cause of action for "deprivations of any rights, privileges, or immunities secured by the Constitution and laws." To state a claim upon which relief may be granted under § 1983, the plaintiff must allege "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993)).

Defendants move for summary judgment on several grounds which, if accepted, would entitle them to judgment. First, defendants argue that plaintiff does not have a "liberty" interest that falls within the Fourteenth Amendment's protection. Second, defendants contend that even assuming that plaintiff has a liberty interest under the Due Process Clause, plaintiff received all the process that was constitutionally due to her. Third, defendants argue that an Article 78 proceeding under the New York Civil Practice and Rules is plaintiff's exclusive remedy. The individual defendants also argue that plaintiff's claims against them should be dismissed under the doctrine of qualified immunity.

### B. Procedural Due Process

■] Plaintiff asserts only a procedural due process claim. An individual "is not entitled to constitutional protection under the Due Process Clause unless that party can demonstrate that: (a) there has been a deprivation of liberty or property in a constitutional sense; and (b) the procedures used by the state to effect this deprivation were constitutionally inadequate." *Rivera v. Marcus,* 696 F.2d 1016, 1022 (2d Cir. 1982) (citing *Smith v. Organization of Foster Families for Equality and Reform ("OFFER")*, 431 U.S. 816, 847, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)), *see Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiff asserts that she was deprived of liberty, not property, protected by the Due Process Clause. Thus, the threshold determination that the Court must make is whether plaintiff was deprived of a liberty interest protected by the Due Process Clause.

### 1. Liberty Interest in Pre–Adoptive Foster Care Relationship

Plaintiff asserts that she has a constitutionally protected liberty interest in the integrity and stability of her pre-adoptive foster care relationship. Specifically, plaintiff argues that there is a constitutionally protected liberty interest in the continuity of a foster care relationship where, as here, the foster parent has cared for the foster child for several years continuously from the child's infancy, the foster child had not known any other parent, the biological parents' parental rights over the child were terminated, and the foster parent had applied to adopt the foster child.

■ The Supreme Court has affirmed that "[c]hoices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has ranked as 'of basic importance in our society,' ... rights sheltered by the Fourteenth Amendment against the State's unwanted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.,* 519 U.S. 102,

116, 117 S.Ct. 555, 564, 136 L.Ed.2d 473 (1996) (internal citation omitted); *see Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) ("[F]reedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."). The diversity of family constellations in our society have forced the courts to make determinations about what types of familial relationships involve liberty interests protected by the Fourteenth Amendment. Procedural due process protection embraces the parent-child relationship, whether biological or formalized through adoption. *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (biological father who raised his children entitled to due process protection regarding his fitness as parent); *Rivera,* 696 F.2d at 1022 (citing cases). It is now well established that extended families fall within the scope of due process protection. *See, e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 504, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Powell, J., plurality opinion) (noting that minors' relationships with uncles, aunts, cousins, and grandparents merit constitutional protection).

■ The instant case presents difficult issues of whether due process protection extends to a parent-child relationship that has its origin in state law and contract, but in which emotional and psychological ties hoped for in biological families, as well as an expectation of permanency, have developed. The starting point for addressing these issues is the Supreme Court's decision in *OFFER.* In *OFFER,* a class of long-term foster parents and an organization of foster parents alleged under § 1983 that New York State procedures governing the removal of foster children from foster homes violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Plaintiffs in *OFFER* argued that when a child has lived in a foster home for twelve months or more, the foster parent and child develop psycho-

logical and other familial ties; they urged the Supreme Court to recognize that such foster parents have a liberty interest in the survival of the foster family sufficient to merit the protections of the Due Process Clause of the Fourteenth Amendment. *See OFFER*, 431 U.S. at 839, 97 S.Ct. 2094. The Court discussed whether a foster family has such a constitutionally protected liberty interest, but found it unnecessary to resolve that question because, even assuming such an interest, the Court held that New York's pre-removal procedures provided foster parents with adequate procedural protections. *See id.* at 847, 97 S.Ct. 2094.

The *OFFER* Court's discussion of foster family relationships provides guidance on the considerations relevant to determining whether (and what sort of) foster family relationships might involve a due process liberty interest. Indeed, as the Second Circuit Court of Appeals acknowledged in *Rivera*, 696 F.2d at 1024, the Supreme Court suggested in *dictum* in *OFFER* that long-term foster parents may be entitled to some due process protection in view of the mutual care and support developed in these relationships:

> No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.

*OFFER*, 431 U.S. at 844, 97 S.Ct. 2094. The *OFFER* Court went on to note three distinctions between foster parent-child relationships and biological families that it viewed as important. First, there is generally no biological relationship between foster parents and foster children. *See id.*

at 845, 97 S.Ct. 2094. Second, there is a "virtually unavoidable" tension between the rights of biological parents and those of foster parents. *Id.* at 846, 97 S.Ct. 2094. Third, "whatever emotional ties may develop between foster parent and foster child," the relationship has its origins, "in state law and contractual arrangements." *Id.* at 845, 97 S.Ct. 2094. As to this third consideration, the Court noted that "[w]hile the Court has recognized that liberty interests may in some cases arise from positive-law sources, ... in such a case, and particularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with State, it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id.* at 845–46, 97 S.Ct. 2094; *see also Rivera*, 696 F.2d at 1024 (identifying three distinguishing factors of foster families discussed in *OFFER*).

In view of these considerations, Ms. Rodriguez's relationship with Andrew seems to present a relatively strong case for the recognition of a liberty interest in a foster parent's relationship with her foster child. Andrew was placed in foster care with Ms. Rodriguez in his first month of life, he never knew his biological parents, and he remained continuously in Ms. Rodriguez's care until his removal on March 18, 1994. During this time, the record suggests that Ms. Rodriguez held the same place in his emotional life, and fulfilled the same socializing functions, as a biological parent or relative. Because Andrew's biological mother's parental rights were terminated prior to the time of his removal, there is no foreseeable, much less unavoidable, conflict between the rights of Andrew's biological parents to a relationship with Andrew and recognition of a liberty interest in Ms. Rodriguez's relationship with him. Furthermore, at the time of his removal, Ms. Rodriguez had entered into an Adoptive Placement Agreement with McCloskey. The Adoptive Placement Agreement, entered into in August 1993,

formally expressed Ms. Rodriguez's intention to adopt Andrew. Indeed, as noted above, two months after the Adoptive Placement Agreement had been signed, in November 1993, McCloskey reported to CWA that its goal was "adoption finalization" for Andrew with Ms. Rodriguez, and that it was awaiting a court date for adoption finalization.

.Thus, unlike the foster parents in decisions subsequent to *OFFER* that have found that foster parents do not have a liberty interest in their relationships with their foster children,[2] as a prospective adoptive parent who had entered into an Adoptive Placement Agreement, Ms. Rodriguez cannot be said to have expected her relationship with Andrew to end. *See Thelen v. Catholic Soc. Servs.*, 691 F.Supp. 1179, 1184 (E.D.Wis.1988) (distinguishing liberty interest of. prospective adoptive parents from foster parents). By entering into the Adoptive Placement Agreement, the State (through McCloskey) expressed its interest in Andrew's adoption by Ms. Rodriguez, so long as McCloskey contin-

ued to view adoption as in Andrew's best interest. Hence, while Ms. Rodriguez's expectations as to Andrew at the outset of her relationship with him were not necessarily permanent, by the time that she entered the Adoptive Placement Agreement, such intentions and expectations of permanency had formed.

The reasonableness of Ms. Rodriguez's expectations must be assessed in the context of relevant New York statutes and regulations, and her contract with McCloskey. *See OFFER*, 431 U.S. at 845–46, 97 S.Ct. 2094 (noting that where claimed liberty interest derives from contractual relations with state it is appropriate to ascertain from state law the expectations of the parties).[3] New York state law, as well as the Adoption Placement Agreement signed by Ms. Rodriguez, make clear that until the child is legally adopted, legal custody remains with the authorized state agency, which may remove the child if the agency believes that it in the child's best interest. *See* N.Y. Soc. Servs. Law § 383(2);[4] Pl.

2. *See, e.g., Wildauer v. Frederick County*, 993 F.2d 369, 372 (4th Cir.1993) (holding that plaintiff non-licensed foster parent did not have liberty interest in relationship with foster children); *Renfro v. Cuyahoga County Dep't of Human Servs.*, 884 F.2d 943, 944 (6th Cir.1989) (holding that foster parents' relationship with foster child did not involve a liberty interest); *Sherrard v. Owens*, 484 F.Supp. 728, 741–42 (W.D.Mich.1980), *aff'd*, 644 F.2d 542 (6th Cir.1981) (per curiam) (same); *Kyees v. County Dep't of Public Welfare*, 600 F.2d 693, 695, 697 (7th Cir.1979) (per curiam) (same); *Drummond v. Fulton County Dep't of Children's Services*, 563 F.2d 1200, 1207 (5th Cir.1977) (en banc) (same); *but see Rivera v. Marcus*, 696 F.2d 1016, 1024–25 (2d Cir.1982) (holding that relationship between half-sister and foster parent of half-sister and foster child had constitutional protected liberty interest in preserving integrity and stability of family); *Brown v. County of San Joaquin*, 601 F.Supp. 653, 662–63 (E.D.Cal.1985) (holding that foster parent had liberty interest in foster care relationship).

3. As the Court noted in *Dietz v. Damas*, 932 F.Supp. 431, 453–54 (E.D.N.Y.1996), "[t]he establishment of a liberty interest on the basis of state law, even when the doctrine was most

in favor, was largely limited to state law regarding the conditions of confinement in prisons and other institutions." *Id.* at 453. The Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), has been read by the Second Circuit Court of Appeals as "calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation." *Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995). There has, however, been only limited application of *Sandin* outside the context of prison regulations. *See Dietz*, 932 F.Supp. at 454. In view of the fact that the Supreme Court in *OFFER* explicitly contemplated looking to state law to discern the expectations of foster parents, the Court bases its holding that there is a liberty interest in Ms. Rodriguez's and Andrew's relationship on the character of the relationship between Ms. Rodriguez and Andrew viewed in the context of applicable state law.

4. N.Y. Soc. Serv. Law § 383(2) provides:

The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall be vested during his minority, or until

Exh. 60.[5.]

However, unlike Georgia state law discussed in *Drummond,* 563 F.2d at 1207, and Indiana state law discussed in *Kyees,* 600 F.2d at 698, New York statutory and regulatory law does not envision foster parents merely as "an alternative to institutional care for what is clearly designated as a transitional phase of the child's life." *Drummond,* 563 F.2d at 1207. Instead, New York foster care law not only permits, but promotes, adoption by long-term foster parents; New York state's statutory and regulatory scheme governing foster care contains several provisions reflecting the view that foster parents are favored adoption applicants for their foster care children. Specifically, as plaintiff points out, New York law includes the following provisions:

1. "Foster parents having had continuous care of a child, for more than twelve months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding involving the custody of the child." N.Y. Soc. Serv. Law § 383(3).

2. When the family court accepts the surrender of a child for adoption, "the court shall inquire whether any foster parent or parents with whom the child resides, or any relative of the child, or other person, seeks to adopt such child. If such person or persons do seek to adopt such child, such person or persons may submit, and the court shall accept, all such petitions for the adoption of the child, together with an adoption home study.... The court shall

thereafter establish a schedule for completion of other inquiries and investigations necessary to complete review of the adoption of the child and shall immediately set a schedule for completion of the adoption." N.Y. Soc. Serv. Law § 383–c(10).

3. An authorized agency "must ... inform foster parents that a child in their care who is free or to be freed for adoption and inform foster parents who have not completed an application to become an adoptive parent of the procedure for applying to adopt the child." N.Y. Comp.Codes R. & Regs. tit. 18 § 421.19(a)(1).

4. "Any adult husband and his adult wife and any adult unmarried person, who, as foster parent or parents, have cared for a child continuously for a period of twelve months or more, may apply to such authorized agency for the placement of said child with them for the purpose of adoption, and if said child is eligible for adoption, the agency shall give preference and first consideration to their application over all other applications for adoptive placements." N.Y. Soc. Serv. Law § 383(3).

5. In evaluating adoption applicants, authorized agencies "shall accept [that] ... [a]pplicants seeking children having these characteristics, foster parents seeking to adopt a child who has resided in their home 12 continuous months ... shall receive first priority for adoption stud-

---

5. The Adoption Placement Agreement provides that "legal custody remains with Card. McCloskey and that this adoptive placement agreement remains in effect until the date of discharged by such authorized agency from its care and supervision, in the authorized agency placing out or boarding out such child and any such authorized agency may in its discretion remove such child from the home where placed or boarded.

legal adoption." It also specifies that "legal adoption will take place after both Card. McCloskey and we agree that it is in the child's best interest," and that "[i]f at any time prior to legal adoption it is determined by the agency or by us that the child should be removed from our home, we will cooperate with the agency in carrying this out in a way that serves the best interest of the child in the judgment of the agency." (Def. Exh. E at Exh. A; Pl. Exh. 60.)

ies." N.Y. Comp.Codes R. & Regs. tit. 18 § 421.13(a).

6. "In any agreement between an authorized agency and foster parents with whom a child or children are to be placed or boarded, there shall be contained therein the following language: 'It is duly acknowledged by the parties hereto that pursuant to the law of the state of New York, a foster parent shall have preference in any proceedings to adopt the child subject to this agreement upon such child having been in the custody of such foster parent for a period in excess of twelve months.'" N.Y. Soc. Serv. Law § 374(1–a).

7. Foster parents "in whose home the child resided or resides at or after the expiration of a continuous period of twelve months in foster care" shall receive notice of a hearing to review the foster care status of a child who has been freed for adoption, among other events. N.Y. Soc. Serv. Law § 392(4)(c).

8. An adoption subsidy is available for "hard to place children." Among several other grounds, "the child is hard to place with parent(s) other than his/her present foster parent(s) because he/she has been in care with the same foster parent(s) for 18 months or more prior to the signing of the adoption placement agreement by such foster parent(s) and has developed a strong attachment to his/her foster parent(s) while in such care and separation from the foster parent(s) would adversely affect the child's development." N.Y. Comp.Codes R. & Regs. tit. 18 § 421.24(a)(3)(f).

These provisions for notice to foster parents of proceedings involving the legal custody status of their foster children of more than twelve months indicate that New York recognizes that such long-term foster parents have an interest in their foster children's custody status. New York's provisions for long-term foster parents' applications for adoption of their foster children to receive priority over other applications for adoption home studies also indicate that New York encourages foster parents to adopt their foster children. Indeed, this provision combined with the adoption subsidy for foster parents attempting to adopt a foster child who has been in their care for more than 18 months provides a statutory incentive to potential adoptive parents to become foster parents as a means to adoption.

In *Procopio v. Johnson,* 994 F.2d 325 (7th Cir.1993), the Seventh Circuit Court of Appeals examined a similar preference for foster parents in the adoption process in Illinois law. In *Procopio,* a couple wishing to adopt a child had been instructed by an adoption agency that they had a better chance if they became foster parents. The couple became foster parents to a two-month old girl, and cared for her continuously for over four years; her biological parents then successfully petitioned the Illinois juvenile court for custody over the girl. See *id.* at 326–27. Despite the girl's biological parents' drug and criminal records, the Illinois Department of Child and Family Services had developed a plan to work toward the goal of returning the girl to her biological parents. This plan was interrupted when the state court found the child's biological parents unfit to care for the child. The plan was again pursued, this time with success, once the child's biological parents were living together and enrolled in drug treatment programs. See *id.* at 327. After the child was returned to her parents' custody, the foster parents argued that they had a liberty interest in their relationship with her based on an Illinois statute, which provided that a child's legal guardian "shall give preference and first consideration to [the foster parents'] application over all applications for adoption but the guardian's final decision shall be based on the welfare and best interest of the child." *Id.* at 328 (quoting Ill.Rev.Stat. ch. 40 ¶ 1519.1(b)). In re-

sponse to this argument, the Seventh Circuit held that this statute did not create a liberty interest in the foster parents' family relationship. The *Procopio* court reasoned that this statutory preference did not rise to the level of expectancy or an entitlement because Illinois state law provides: (1) that foster parents wishing to adopt obtain permission from the natural parents or legal guardian if parental rights have been terminated, and (2) that the juvenile court has "sole discretion" to make the "final determination" about the adoption. *Id.* at 329.

This Court does not reach the same conclusion as *Procopio* despite the similarity in New York's and Illinois's statutory provisions granting a preference for foster parents as adoptive parents. Unlike the situation in *Procopio,* Andrew's biological mother's parental rights had been terminated; neither McCloskey nor CWA had plans to return him to his biological mother or to find his biological father. Further, pursuant to New York's provisions giving preference for adoption to long term foster parents, Ms. Rodriguez had entered into an Adoptive Placement Agreement with McCloskey at the time of his removal, and was awaiting adoption finalization from the family court. Thus, while McCloskey and the state court ultimately would decide whether Ms. Rodriguez, as a prospective adoptive foster parent, would gain permanent custody of Andrew, it cannot be said that Ms. Rodriguez, with whom Andrew had been placed first pursuant to a foster care agreement and then under an Adoptive Placement Agreement, had a reasonable expectation under New York law that her relationship with Andrew would eventually be terminated. *See Thelen v. Catholic Soc. Servs.,* 691 F.Supp. 1179, 1185 (E.D.Wis.1988) (holding under Wisconsin law that prospective adoptive parents had a limited constitutionally protected liberty interest in family unit). Accordingly, viewing the character of the relationship between Ms. Rodriguez and Andrew in the context of New York law, the Court holds that Ms. Rodriguez had a liberty interest within the Fourteenth Amendment's Due Process Clause in her relationship with her foster and prospective adoptive child Andrew at the time of his removal from her home on March 18, 1994. This holding recognizes such a liberty interest in only a discretely identifiable set of foster parents, (1) whose foster children's biological parents' parental rights have been terminated, (2) who have cared for their foster children continuously for more than twelve months since the child's infancy, (3) and who have entered into an adoptive placement agreement for their foster child. The Court thus rejects defendants' suggestion that recognizing a liberty interest in the context of this case will open the door to a flood of federal litigation reviewing unique aspects of foster family relationships.

### 2. *The Process That Was Due*

■ "Whether procedural due process must be afforded because a 'liberty' or 'property' interest is within the Fourteenth Amendment's protection, there must be determined 'what process is due' in the particular context." *OFFER,* 431 U.S. at 847, 97 S.Ct. 2094. The Court now considers whether the procedures employed by defendants on and after Andrew's removal were constitutionally adequate. The quantum of process constitutionally required "is not subject to specific measurement." *Rivera,* 696 F.2d at 1026.

> For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." ... Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a

particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Id.* at 1026–27 (internal citations omitted). Due process fundamentally requires that the aggrieved party be provided with an opportunity to be heard, " 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). The "meaningfulness" of the process is considered in light of three factors enunciated by Justice Powell for the Court in *Mathews:*

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. 893; *see Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting same); *Goetz v. Crosson,* 41 F.3d 800, 803 (2d Cir.1994), cert. denied, 516 U.S. 821, 116 S.Ct. 80, 133 L.Ed.2d 39 (1995); *Rivera,* 696 F.2d at 1027. The Court analyzes under the *Mathews* balancing test plaintiff's claim that Ms. Rodriguez did not receive adequate notice and opportunity to be heard (1) to contest Andrew's removal, and (2) to challenge

McCloskey's denial of her requests to visit Andrew. In both of these inquiries, the Court is mindful of the Supreme Court's guidance in *OFFER:* "We deal here with issues of unusual delicacy, in an area where professional judgments regarding desirable procedures are constantly and rapidly changing. In such a context restraint is appropriate on the part of courts called upon to adjudicate under the Constitution." *OFFER,* 431 U.S. at 855–56, 97 S.Ct. 2094.

Plaintiff alleges several distinct violations of the process that she was due. As mentioned above, plaintiff alleges that defendants violated plaintiff's rights to due process as guaranteed by the Fourteenth Amendment by (1) removing Andrew from Ms. Rodriguez's home on March 18, 1994 without providing Ms. Rodriguez with preremoval notice and an opportunity to be heard; (2) not providing timely notice of this removal or timely post-removal opportunity to be heard, and (3) not providing Ms. Rodriguez a timely opportunity to contest McCloskey's denial of her requests to visit Andrew. The Court addresses these claims in turn.

### a. Was an Emergency Removal Warranted?

Defendants argue that McCloskey's removal of Andrew on March 18, 1994 constituted an emergency removal under New York's regulatory provisions governing notice to foster parents in the event of removal, N.Y. Comp.Codes R. & Regs. tit. 18 § 443.5,[6] and the analogous New York City

---

6. N.Y. Comp.Codes R. & Regs. tit. 18 § 443.5 provides:

> (a) Whenever a social services official or another authorized agency acting on his behalf proposes to remove a child in foster family care from the foster family home, he or such other authorized agency, as may be appropriate, shall notify the foster family parents, in writing, of the intention to remove such child. Such notification shall be given at least 10 days prior to the proposed effective date of the removal, except where the health or safety of the child requires

> that the child be removed immediately from the foster family home. Such notification shall further advise the foster family parents that they may request a conference with the social services official or a designated employee of the local social services district at which time the foster parents, with or without a representative, may appear to have the proposed action reviewed, be advised of the reasons therefor and be afforded an opportunity to submit reasons why the child should not be removed. Each social services official shall instruct

regulation, SSC Procedure No. 5 (Def. Exh. P at Exh. C.). Defendants contend that these two regulatory provisions do not require notice to foster parents of the authorized agency's intent to remove the child prior to an emergency removal. Therefore, defendants maintain that McCloskey was not required to give Ms. Rodriguez either notice or an opportunity to be heard prior to removing Andrew. In response, plaintiff urges that Ms. Rodriguez was entitled, under both New York law and the Constitution, to pre-removal notice and opportunity to be heard because, they contend, Andrew's removal was not an emergency, or, at a minimum, whether it was an emergency is a question of fact for trial.

■ Both § 443.5 and SSC Procedure No. 5 exempt emergency removals from the requirements of pre-removal notice and opportunity to be heard. Section 443.5 provides that "[s]uch notification shall be given at least 10 days prior to the proposed effective date of the removal, except where the health or safety of the child requires that the child be removed immediately from the foster family home." Similarly, SSC Procedure 5 states that pre-removal notice requirements "do not apply when the health and safety of a child

and require any authorized agency acting on the official's behalf to furnish notice in accordance with the provisions of this section. Foster parents who do not object to the removal of the child from their home may waive in writing their right to the 10–day notice, provided, that such waiver shall not be executed prior to the social services official's or authorized agency's determination to remove the child from the foster home and the receipt by the foster parents of notification of such determination.
(b) Upon the receipt of a request for such conference, the social services official shall set a time and place for such conference to be held within 10 days of receipt of such request and shall send written notice of such conference to the foster family parents and their representative, if any, and to the authorized agency, if any, at least five days prior to the date of such conference.
(c) The social services official shall render and issue his decision as expeditiously as

are endangered." (Def. Exh. P. at Exh. C.) "[I]t was, and remains, equally well established that officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a prior court order.'" *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 826 (2d Cir.1977)) (other citations omitted). Where there is an objectively reasonable basis for government officials to believe that a threat to a child's health or safety is imminent, the Constitution does not prevent government officials from removing a child from his or her parent's custody without a prior hearing. *See Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996); *Dietz,* 932 F.Supp. at 444 (noting same).

■ The Second Circuit Court of Appeals has instructed that "[e]mergency circumstances mean circumstances in which the child is immediately threatened with harm, ..., for example, where there exists an 'immediate threat to the safety of the child,' ... or where the child is left bereft of care and supervision, ... or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence...." *Hurlman v. Rice,* 927 F.2d 74, 80 (2d Cir.1991). Defendants

possible, but not later than five days after the conference, and shall send a written notice of his decision to the foster family parents and their representative, if any, and to the authorized agency, if any. Such decision shall advise the foster family parents of their right to appeal to the department and request a fair hearing in accordance with section 400 of the Social Services Law.
(d) In the event there is a request for a conference, the child shall not be removed from the foster family home until at least three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later.
(e) In any agreement for foster care between a social services official, or another authorized agency acting on his behalf, and foster parents, there shall be contained therein a statement of a foster parent's rights provided under this section.

argue that there were emergency circumstances justifying removal in this case because Andrew was left "bereft of care and supervision." *Id.; see also Duchesne,* 566 F.2d at 825–26 (concluding circumstances justified emergency removal where children were left bereft of care). Defendants also point out that New York foster care regulations require that foster parents agree "never to leave children under the age of 10 alone without competent adult supervision...." N.Y. Comp.Codes R. & Regs. tit. 18 § 444.5(c)(3), a requirement that was printed in the Foster Care Manual McCloskey provides to its foster parents. (Def.Exh. U.)

When a New York state court reviews an administrative decision to remove a child, the court asks whether the removal decision was arbitrary or capricious. *See, e.g., Banks–Nelson v. Bane,* 214 A.D.2d 338, 625 N.Y.S.2d 131, 132 (1st Dep't 1995); *Peters v. McCaffrey,* 173 A.D.2d 934, 569 N.Y.S.2d 797, 798 (3d Dep't 1991). Relying on this law, plaintiff argues that McCloskey's decision to remove Andrew was arbitrary or capricious. However, when reviewing procedural due process challenges to whether there were emergency circumstances to justify the removal of a child from his or her parents' custody, the Second Circuit Court of Appeals asks whether there is "an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." *Gottlieb,* 84 F.3d at 520; *Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992).

The Court construes plaintiff's contentions that the removal was arbitrary or capricious as arguments that there was no objectively reasonable basis for believing there was an imminent danger to Andrew (and Thomas) by leaving them without adult supervision. Plaintiff contends that McCloskey's decision to remove Andrew was without such a basis in view of the facts that: (1) Ms. Rodriguez had a good history as a foster parent, (2) McCloskey had encouraged Ms. Rodriguez to be more trusting of neighbors and other family members in caring for the foster children, (3) Ms. Rodriguez had arranged for a neighbor to babysit on the day of Andrew's removal, (4) Ms. Rodriguez had been informed that this neighbor would return in a few minutes, (5) Ms. Rodriguez had child-proofed her home, (6) Edwin was almost 13 years old, and was capable of supervising the children, (7) a next-door neighbor was available in case of emergency and informed the McCloskey case worker of that fact, (8) Mr. Monplaisir found the situation in Ms. Rodriguez's home safe enough to leave to telephone McCloskey, and (9) there were two babysitters certified by McCloskey in the same apartment building.

Even accepting plaintiff's view of these facts, plaintiff cannot avoid the fact that there was no adult present to supervise Ms. Rodriguez's three and four-year old children when Mr. Monplaisir arrived for a scheduled visit to the home, nor that no adult arrived to assume responsibility for the children during the time (of at least two hours) that he was present. Further, Mr. Monplaisir observed that Edwin was having difficulty keeping the children under control, and appeared to be overwhelmed by the situation. Thus, in the time before McCloskey removed the children, Ms. Rodriguez had violated New York's foster care regulations requiring that foster children under 10 years must never be left without adult supervision. *See* N.Y. Comp.Codes R. & Regs. tit. 18 § 444.5(c)(3).

In the context of this case, this violation itself provides an objective basis for McCloskey's belief that leaving a three and four-year old in the care of only a twelve-year old boy posed an imminent threat to the health or safety of the children. But even without this regulatory violation, the Court would conclude that no reasonable juror could find that McCloskey lacked an objective basis to believe that Andrew and Thomas were left bereft of supervision so as to pose a sufficient threat to these children's health or safety to justify an

emergency removal. As long as there is an objective basis for fear of imminent injury to the children, it is not the role of the court (either on a motion or through a jury verdict) to second-guess, with the benefit of hindsight, the case worker's and foster agency officials' on-the-spot determination to remove a child left without adult supervision. Accordingly, the Court grants summary judgment in favor of defendants as to plaintiff's claim that the circumstances did not justify an emergency removal, and thus dismisses plaintiff's claim that she was entitled to pre-removal notice and an opportunity to be heard.

b. *Post–Removal Notice and Opportunity to Heard*

"[I]n those 'extraordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." *Duchesne,* 566 F.2d at 826 (citing *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). Although Ms. Rodriguez contacted McCloskey by telephone on the day of Andrew's removal to determine what had happened to her foster children, Ms. Rodriguez did not received written notice of Andrew's removal, including notification of her rights and procedures to contest removal, until approximately June 15 or June 16, 1998, almost three months after Andrew's removal. Ms. Rodriguez's first scheduled opportunity to be heard to contest Andrew's removal was a Fair Hearing before a New York Administrative Law Judge on June 15, 1994, which was adjourned to July 15, 1994. In the interim, on June 28, 1994, an Independent Review was conducted, at which time Ms. Rodriguez had her first opportunity to be heard to contest Andrew's removal.

Defendants take the position that New York State and New York City regulations governing removals of foster children do not require written notice of removal subsequent to an emergency removal, notifying her of her opportunity to contest the removal, nor do they require an opportunity to be heard to contest the removal within ten days, as N.Y. Comp.Codes R. & Regs. tit. 18 § 443.5 plainly requires for non-emergency removals. Defendants thus maintain that Ms. Rodriguez's New York state and city procedural rights to contest Andrew's removal were not violated. McCloskey's general agency practice is not to provide written notice of removal in emergency removals, (McMurray Dep. at 170), but as a courtesy to the foster parents, to provide oral notice of removal. (McLoughlin Dep. at 158.)[7] Plaintiff asserts that N.Y. Comp.Codes R. & Regs. tit. 18 § 443.5 requires written notice of removal contemporaneously with the removal and the opportunity to appear at a conference ten days after it is requested in emergency removals. (Pl. Mem. at 62–64.)

Neither the parties nor the Court were able to locate any decisions addressing whether the § 443.5 requirements for written notice and an opportunity to contest a removal apply to emergency removals of foster children. Because the plaintiff foster parents in *OFFER* were challenging the constitutionality of New York's pre-removal procedures, not its post-removal procedures for emergency removals, the *OFFER* Court did not have occasion to address notice and hearing requirements in emergency removals.

However, "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process." *Robison,* 821 F.2d at 923. As a result, not every violation of a procedure required by state law is a violation of due process protected by the Constitution. *See id.; Doe v. Connecticut,* 911 F.2d 868, 869 (2d Cir.1990); *Duchesne,* 566 F.2d at 827; *Dietz,* 932 F.Supp. at 453. Because

7. In this regard, the Court notes that it rejects defendants' argument that their actions were mere negligence, and thus not subject to § 1983 liability.

this Court faces a question of whether plaintiff's due process rights were violated, the Court declines to resolve the parties' dispute as to whether § 443.5 requires notice and a post-removal opportunity to be heard in emergency removals.

In the context of an emergency removal of a biological child from its parents' custody, the Second Circuit has specified that the delay in providing a hearing must be short:

> Where there has been an emergency removal of a child from a parent's custody without a hearing, due process requires that the state procedures provide the parent an opportunity to be heard at a reasonably prompt time after the removal.

*Gottlieb,* 84 F.3d at 520; *see also Duchesne,* 566 F.2d at 828 (delay of twenty-seven months in providing biological parent opportunity to be heard violated constitutional due process); *Cecere,* 967 F.2d at 830 (four day assertion of custody in emergency situation permissible); *cf. Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983) (twelve day delay in providing hearing did not violate due process).

Subsequent to *Gottlieb, Gottlieb's* "reasonably prompt" opportunity to be heard requirement has been applied by only one district court. In *Sundbye v. Ogunleye,* 3 F.Supp.2d 254, 265 (E.D.N.Y.1998), the court held that CWA's delay of six weeks in filing of family court petition of abuse "was not even close to 'reasonably prompt.'" *Id. Cf. Whisman v. Rinehart,* 119 F.3d 1303, 1310–11 (8th Cir.1997) (hearing held seventeen days after emergency removal was not sufficiently prompt and thus did not provide mother with an adequate post-deprivation remedy). Thus, when the state removes a child from his biological parents' custody, it must provide an opportunity to contest the removal within weeks—not months—after the removal.

The Court examines the process provided to Ms. Rodriguez under the *Mathews* test in view of the Second Circuit's treatment of post-removal due process challenges of natural parents. *See Mathews,* 424 U.S. at 333, 96 S.Ct. 893. The first factor is the private interest affected by the deprivation. Even though Ms. Rodriguez's interest in a prompt hearing to determine the appropriateness of Andrew's removal (as well as its duration) may be less than that of a parent who is also the legal guardian of the child, Ms. Rodriguez's interest is a strong one. Like a biological parent, Ms. Rodriguez had cared for Andrew since his infancy and expected that he would be with her permanently. Where, as here, a child has been in continuous custody of a foster parent since early infancy, the Court sees no basis for distinguishing the foster child's interest in a prompt hearing from that of a biological child or an adopted child.

In the context of an emergency removal, the risk of an erroneous deprivation—the second *Mathews* factor—is comparable for children removed from their biological parents' custody and for foster children removed from their foster parents' care. In both cases, the aggrieved parent has no opportunity to explain or defend the conditions that provoked the state to remove the child. *See Rivera,* 696 F.2d at 1027–28 (commenting that removal procedures that provide foster parents no opportunity to explain or defend their fitness create potential for erroneous deprivation). Insofar as social workers monitor foster parents more closely than they typically monitor biological parents, social workers deciding whether circumstances warrant an emergency removal may have more background information about the foster family than they have about a biological family. Still in both cases there is significant potential for an erroneous deprivation of the parents' and child's private interests in remaining together.

The interest and burden on the Government—the third *Mathews* factor—is also comparable regardless of whether the child was removed from his biological par-

ents' custody or the care of a pre-adoptive foster parent, such as Ms. Rodriguez. Furthermore, in view of New York's regulatory requirement for a pre-removal opportunity to be heard for all foster parents in the event of non-emergency removals, *see* N.Y. Comp.Codes R. & Regs. tit. 18 § 443.5, providing such a post-deprivation hearing in emergency removals should not be a heavy burden on the state. The procedural mechanisms and institutions that would be needed for post-deprivation hearings are already provided in non-emergency removals.

In view of Ms. Rodriguez's interest in not being erroneously separated from Andrew, the potential for such error in an emergency removal, and the fact that the state already provides an opportunity to be heard in non-emergency foster care removals, the Court finds that the delay from March 18, 1994 until June 15, 1994 in providing written notice of removal, and until June 28, 1994 in providing an opportunity to be heard to contest the removal, was not reasonably prompt, and therefore violated plaintiff's rights to due process guaranteed by the Due Process Clause of the Fourteenth Amendment. For these reasons, the Court denies defendants' motion for summary judgment as to plaintiff's claim that the delay in proving Ms. Rodriguez post-removal notice and opportunity to be heard violated her procedural due process rights.

### c. Denial of Visitation

■ Plaintiff argues that defendants' failure to provide Ms. Rodriguez a timely opportunity to be heard as to why she should have been allowed to visit Andrew, during the period that he was removed from her care, also violated constitutional due process. On March 31, 1994, Ms. Rodriguez requested through her attorney to be allowed to visit Andrew. On or about March 18, 1994, McCloskey submitted a Report of Suspected Child Abuse or Maltreatment to the New York State Central Registry; that report initiated an investigation into the circumstances surrounding Andrew's removal by OCI. On April 6, 1994, McCloskey's attorney advised Ms. Rodriguez that her request for visitation was being evaluated, pending the outcome of OCI's investigations. At the June 15, 1994 court conference before an Administrative Law Judge, Ms. Rodriguez's attorney again requested that Ms. Rodriguez be allowed to visit Andrew. McCloskey allowed Ms. Rodriguez to visit Andrew on June 27, 1994, and on July 8, 1994.

Courts have held that the reduction of biological parents' visitation rights regarding children over whom the state has asserted legal custody implicate the Due Process Clause, because such a decision "may infringe upon a parent's interest in the 'care, custody, and management of their child.'" *Fitzgerald v. Williamson,* 787 F.2d 403, 408 (8th Cir.1986). Similarly, Ms. Rodriguez had an interest in visiting Andrew, if only to provide him with her own explanation of the separation, attempt to reduce his sense of abandonment, and ease her own concerns about his wellbeing. This interest in visiting Andrew during the time that he was removed from her care derives from her underlying interest in her relationship with Andrew. In view of the Court's holding above that Ms. Rodriguez has a constitutionally protected liberty interest in the stability of her relationship with Andrew, the Court concludes that the deprivation of any visitation between Ms. Rodriguez and Andrew during the time of his removal also implicates a constitutionally protected liberty interest.

The Court's *Mathews* analysis is similar for both Ms. Rodriguez's challenge to the promptness of the hearing she was provided to contest the denial of visitation, and her challenge to the promptness of her opportunity to be heard to contest the removal. Ms. Rodriguez's interest in Andrew's returning to her care also included an interest in visiting him between the time of his removal and her opportunity to contest it. Further, Ms. Rodriguez has an interest in visiting Andrew independent of

her interest in his return: to comfort him and to offer some explanation for their separation. The risk of erroneous deprivation is similar to that involved in the underlying removal decision (if lessened slightly because the agency may have had more time to assess the basis for the removal decision). Where, as here, the child would not be endangered by supervised visits, and visits are likely to be important in countering the child's sense of abandonment, the government's goal to further the best interest of the child is not in conflict with allowing an opportunity to contest the failure to provide visitation. Because foster care agencies have resources for facilitating supervised visitation, and because of the potential benefit to the child of having contact with the only parent he has ever known, the Court holds that the failure of defendants to provide Ms. Rodriguez any opportunity to contest the decision not to allow her to visit Andrew from March 18, 1994 until June 28, 1994 violated Ms. Rodriguez's due process rights. Accordingly, the Court denies defendants' motion for summary judgment as to plaintiff's visitation claim.

### D. Article 78 Exhaustion

■ Defendants contend that plaintiff has no cause of action under § 1983 because an Article 78 hearing, together with judicial review of the Article 78 decision, is plaintiff's exclusive legal remedy. Defendants are correct that an appeal from an Article 78 proceeding is a foster parent's exclusive remedy to challenge the removal of foster child and to re-obtain foster care for the child. As the court in *In re Dina Michelle S.*, 236 A.D.2d 544, 653 N.Y.S.2d 677, 678 (2d Dep't 1997), explained:

Social Services Law § 400 and 18 NYCRR 443.5 outline a clear procedure for foster parents aggrieved by a decision to relocate their foster children. First, the foster parents may request a departmental review of the agency's decision. They may then request a "fair hearing" to challenge the outcome of the

departmental review. Finally, if still aggrieved, the foster parents may commence a CPLR 78 proceeding. This three-step scheme satisfies the requirements of due process and provides the sole remedy for foster parents who wish to challenge the removal of a child....

*Id.* However, as plaintiff points out, Ms. Rodriguez does not seek the return of her foster child. If that were her requested relief, then the prescribed statutory procedure would be her exclusive remedy. Rather, plaintiff seeks a declaratory judgment and monetary damages. The Court is not persuaded by defendants' suggestion that despite this difference in the relief plaintiff seeks, plaintiff is precluded from pursuing a § 1983 action because she pursued her state remedies to their conclusion. In this regard, defendants argue that § 1983 does not provide a remedy when the governing statute provides an exclusive remedy for violation of its terms. But each of the decisions upon which defendants rely, *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 28 n. 21, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Irby v. Sullivan*, 737 F.2d 1418, 1428 (5th Cir.1984), addresses a plaintiff who seeks to recover for a violation of a federal statute. When the governing federal statute contains remedial devices that are "sufficiently comprehensive," *Middlesex*, 453 U.S. at 19–20, 101 S.Ct. 2615, a § 1983 action is precluded. *See id.; Irby*, 737 F.2d at 1428 (Title VII provides sufficiently comprehensive remedial device to support an inference that Congress intended those remedies to be exclusive, and a § 1983 action is precluded). Because plaintiff seeks to recover for a violation of a constitutionally protected right, as opposed to a right protected by a federal statute, there is no such bar. Relying on *Spielman v. Hildebrand*, 873 F.2d 1377 (10th Cir.1989), defendants also argue that plaintiff's pursuit of her state statutory remedies bars her § 1983 claim. But in

*Spielman,* the court applied § 1983 and concluded that the Kansas procedures provided to the plaintiffs, which the plaintiffs utilized, did not violate due process. *Id.* at 1385. Because plaintiff seeks relief other than return of a foster child, the New York statutory scheme, including an Article 78 proceeding, does not provide the exclusive remedy. Accordingly, the Court rejects defendants' argument that plaintiff's § 1983 action is barred.

### E. *Qualified Immunity*

■ Individual defendants Marjorie McLoughlin and Barbara McMurray argue that they are immune from liability under the doctrine of qualified immunity. The doctrine of qualified immunity "shields public officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, ... or insofar as it [is] objectively reasonable for them to believe that their acts d[o] not violate those rights." *Whalen v. County of Fulton,* 126 F.3d 400, 404 (2d Cir.1997) (internal citations and quotes omitted).

■ The individual defendants are not entitled to qualified immunity because they are not "public officials." In *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), the Supreme Court noted that the performance of a governmental function by a private defendant does not in itself entitle the private defendant to assert a qualified immunity defense. The Court explained that under *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), "private actors are not *automatically* immune (i.e., § 1983 immunity does not automatically follow § 1983 liability)." *Id.* at 2108 (emphasis in original). *Richardson* set forth a two-part analysis to determine whether a private defendant should be entitled to qualified immunity, based on considerations of history and public policy. Neither consideration compels a grant of qualified immunity to the individual defendants in this case.

The *Richardson* Court explained that immunity is proper only where there is "evidence of an historical tradition of immunity for private parties carrying out these functions." *Id.* at 2105. Defendants have offered no evidence that there is a tradition of governmental immunity for private parties engaged in foster care, *see White v. Chambliss,* 112 F.3d 731, 738 (4th Cir.1997) (" 'The care of foster children is not traditionally the exclusive prerogative of the State.' ") (quoting *Milburn v. Anne Arundel County Dep't of Soc. Svcs.,* 871 F.2d 474, 479 (4th Cir.1989)), and even foster care workers employed by the government are not necessarily entitled to qualified immunity, *see Doe v. Jefferson County,* 985 F.Supp. 66, 71 (N.D.N.Y. 1997). Although the court in *Bartell v. Lohiser,* 12 F.Supp.2d 640 (E.D.Mich. 1998), found that qualified immunity would be appropriate for private foster care workers, it failed to address the first prong of the *Richardson* analysis. Furthermore, the decisions upon which it relied to suggest that qualified immunity was appropriate for private foster care workers predated *Richardson. See Bartell,* 12 F.Supp.2d at 646.

Public policy considerations do not favor conferring qualified immunity in the circumstances of this case. The McCloskey agency is subject to competitive market pressures, operating pursuant to a contract with the City. The agency therefore has an incentive not to be unduly timid in protecting the children under its care, but rather has an incentive to discharge its duties responsibly, so that the City will renew its contract. Thus a significant justification for qualified immunity, to insure responsible job performance by governmental employees, is not present in this case. *Cf. Richardson,* 117 S.Ct. at 2107 ("[M]arketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'non-arduous' employee job performance.").

In sum, the Court finds that the McCloskey agency is similar, albeit not identical, to the entity in *Richardson*, which was "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, [which] undertakes that task . . . potentially in competition with others." *Richardson*, 117 S.Ct. at 2108. Accordingly, like the employees of the private firm in *Richardson*, the individual defendants in this case are not entitled to qualified immunity.[8] Accordingly, the Court denies defendants' motion for summary judgment as to plaintiff's claims against the individual defendants.

### III. *Conclusion*

For the reasons set forth above, the Court grants in part and denies in part defendants' motion for summary judgment [doc. no. 33]. The Court's previous Opinion and Order of September 15, 1998 is hereby vacated solely as to the discussion of qualified immunity for individual defendants Marjorie McLoughlin and Barbara McMurray.

SO ORDERED.

---

8. This is not to say that the individual defendants are not entitled to a good faith defense, a question that *Richardson* declined to reach. *See Richardson*, 117 S.Ct. at 2108.